237 F.3d 1113 (9th Cir. 2001)
 PEARLIE RUCKER; HERMAN WALKER; WILLIE LEE; BARBARA HILL, Plaintiffs-Appellees,
v.
HAROLD DAVIS; OAKLAND HOUSING AUTHORITY, Defendants,
and
UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Defendant-Appellant.
PEARLIE RUCKER; HERMAN WALKER; WILLIE LEE; BARBARA HILL, Plaintiffs-Appellees,
v.
HAROLD DAVIS; OAKLAND HOUSING AUTHORITY, Defendants-Appellants,
and
UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Defendant.
 Nos. 98-16322, 98-16542
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted March 12, 1999
Opinion filed February 14, 2000 Rehearing
En Banc Granted and Opinion Withdrawn August 18, 2000
Argued and Submitted En Banc September 19, 2000
Filed January 24, 2001
 
 [Copyrighted Material Omitted]
 Gary T. Lafayette, Lafayette, Kumagai & Clarke, San Francisco, California, for defendants-appellants Harold Davis and The Oakland Housing Authority.
 Howard S. Scher, U.S. Department of Justice, Civil Division, Washington, D.C., for defendant-appellant U.S. Department of Housing and Urban Development.
 Whitty Somvichian, O'Melveny & Myers, San Francisco, California, Anne Tamiko Omura, Collective Legal Services-- The Eviction Defense Center, Oakland, California, William Simpich, Mathew Siegel, Oakland, California, Robert Salinas, Sundeen and Salinas, Oakland, California, John Murcko, Oakland, California, for the plaintiffs-appellees.
 Appeal from the United States District Court for the Northern District of California Charles R. Breyer, District Judge, Presiding. D.C. No. CV-98-00781-CRB D.C.
 Before: Joseph T. Sneed, Mary M. Schroeder, Harry Pregerson, Stephen Reinhardt, Ferdinand F. Fernandez, Thomas G. Nelson, Michael Daly Hawkins, Barry G. Silverman, M. Margaret McKeown, Ronald M. Gould, and Richard A. Paez, Circuit Judges.
 Opinion by Judge Hawkins; Dissent by Judge Sneed
 HAWKINS, Circuit Judge:
 
 
 1
 Many of our nation's poor live in public housing projects that, by many accounts, are little more than illegal drug markets and war zones. Innocent tenants live barricaded behind doors, in fear for their safety and the safety of their children. What these tenants may not realize is that, under existing policies of the Department of Housing and Urban Development ("HUD"), they should add another fear to their list: becoming homeless if a household member or guest engages in criminal drug activity on or off the tenant's property, even if the tenant did not know of or have any reason to know of such activity or took all reasonable steps to prevent the activity from occurring ("innocent tenants"). Today we examine the statutory basis behind HUD's "One Strike and You're Out " policy, and hold that Congress did not intend to authorize the eviction of innocent tenants.
 
 I. BACKGROUND
 
 2
 It is undisputed that serious criminal activity, especially drug-related activity, has created a dangerous environment in many public housing projects. Officially recognizing that "public and other federally assisted low-income housing in many areas suffers from rampant drug-related crime, " Congress sought to address the problem with the Anti-Drug Abuse Act of 1988. 42 U.S.C. 11901(2). Congress required each public housing agency to utilize leases which:
 
 
 3
 (5) provide that a public housing tenant, any member of the tenant's household, or a guest or other per son under the tenant's control shall not engage in criminal activity, including drug related criminal activity, on or near public housing premises, while the tenant is a tenant in public housing, and such criminal activity shall be cause for termination of tenancy.
 
 
 4
 42 U.S.C. 1437d(l)(5) (1989). Congress altered the language of this provision slightly in 1990, to require leases that:
 
 
 5
 (5) provide that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants, or any drug related criminal activity on or near such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy.
 
 
 6
 Id. (1991). In 1996, Congress replaced the phrase "on or near such premises" with "on or off such premises. " Id. (1997). Finally, in 1998, the section was unchanged, but redesignated as subsection (l)(6), which is how we refer to it in this opinion. Id. (1999).
 
 
 7
 In 1991, HUD issued regulations implementing subsection (6), which track the pre-96 statutory language very closely. HUD required local public housing authorities ("PHAs") to impose a lease obligation on tenants:
 
 
 8
 To assure that the tenant, any member of the house hold, a guest, or another person under the tenant's control, shall not engage in:
 
 
 9
 (A) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the PHA's public housing premises by other resi dents or employees of the PHA, or
 
 
 10
 (B) Any drug-related criminal activity on or near such premises.
 
 
 11
 Any criminal activity in violation of the preceding sentence shall be cause for termination of tenancy, and for eviction from the unit.
 
 
 12
 24 C.F.R. 966.4(f)(12)(i). When issuing these regulations, HUD made it clear that it interpreted the statute (and its own regulations) as giving local PHAs the authority to evict a tenant whose household members or guests are involved in drug activity, whether the tenant knew or should have known of the activity or tried to prevent the activity. Public Housing Lease and Grievance Procedures, 56 Fed. Reg. 51,560, 51567 (Oct. 11, 1991) ("The tenant should not be excused from contractual responsibility by arguing that the tenant did not know, could not foresee, or could not control behavior by other occupants of the unit.").
 
 
 13
 Initially, HUD encouraged PHAs to use discretion in deciding whether to evict:
 
 
 14
 In deciding to evict for criminal activity, the PHA shall have discretion to consider all of the circum stances of the case, including the seriousness of the offense, the extent of participation by family members, and the effects that the eviction would have on family members not involved in the proscribed activity. In appropriate cases, the PHA may permit continued occupancy by remaining family members and may impose a condition that family members who engaged in the proscribed activity will not reside in the unit.
 
 
 15
 24 C.F.R. 966.4(l)(5)(i). However, a directly conflicting message was sent to the PHAs in 1996 when President Clinton announced the "One Strike and You're Out" policy for combating crime in public housing, which encourages evictions regardless of circumstances and ties federal funding to increased crime-related evictions. John F. Harris, Clinton Links Housing Aid to Eviction of Crime Suspects, Washington Post, March 29, 1996, Section A, available at 1996 WL 3071468.
 
 II. FACTS AND PROCEDURAL BACKGROUND
 
 16
 Because of the increased enforcement under the "One Strike" policy, we are now beginning to see exactly how far reaching HUD's interpretation of 1437d(l)(6) can be. In the case before us, the Oakland Housing Authority ("OHA") commenced separate unlawful detainer actions in Alameda County Municipal Court against four tenants -Pearlie Rucker, Willie Lee, Barbara Hill and Herman Walker -for violation of the lease provision obligating tenants to "assure that tenant, any member of the household, or another person under the tenant's control, shall not engage in . . . [a]ny drug related criminal activity on or near the premises. .. ."
 
 
 17
 Pearlie Rucker is a sixty-three-year-old woman who has lived in public housing since 1985. She lives with her mentally disabled daughter, her two grandchildren and one great grand daughter. OHA sought to evict Rucker because her daughter was found in possession of cocaine three blocks from the apartment. Rucker asserts that she regularly searches her daughter's room for evidence of alcohol and drug use and has never found any evidence or observed any sign of drug use by her daughter. Willie Lee, seventy-one, has been a public housing resident for over twenty-five years and Barbara Hill, sixty-three, has been a public housing resident for over thirty years. Lee and Hill currently live with their grandsons. OHA sought to evict Lee and Hill because their grandsons were caught smoking marijuana together in the apartment complex parking lot. Lee and Hill contend they had no prior knowledge of any illegal drug activity by their grandsons.
 
 
 18
 The fourth tenant, Herman Walker, presents a slightly different situation. He is a disabled seventy-five-year-old man who has lived in public housing for approximately ten years. He is not capable of living independently and requires an in home care giver. On three instances within a two-month time frame, Walker's care giver and two guests were found with cocaine in Walker's apartment. Each time, Walker was issued a lease violation notice; with the third notice, OHA terminated the lease and initiated an unlawful detainer action. Shortly thereafter, Walker fired his care giver.
 
 
 19
 In response to OHA's actions, the tenants filed the present action in federal district court under the Administrative Practices Act, 5 U.S.C. SS 701-706 (the "APA"), arguing that 42 U.S.C. 1437d(l)(6) does not authorize the eviction of innocent tenants. They also argued that if the statute does authorize such evictions, then the statute is unconstitutional. Plaintiff Walker also alleged that his eviction would violate the Americans with Disabilities Act ("ADA").
 
 
 20
 The tenants sought a preliminary injunction enjoining the unlawful detainer actions against them in state court and enjoining the enforcement of HUD's regulation and the corresponding provision in the OHA lease against innocent tenants. To obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised, and the balance of hardships tips sharply in favor of the moving party. Roe v. Anderson , 134 F.3d 1400, 1401-02 (9th Cir. 1998). Applying this standard, the district court found that the tenants had raised serious questions on their claim that HUD's interpretation of 1437d(l)(6) violated the APA. Weighing the plaintiffs' loss of their homes against the delay in OHA's eviction proceedings, the district court found the balance of hardships tipped decisively in the tenants' favor, and enjoined OHA from "terminating the leases of tenants pursuant to paragraph 9(m) of the `Tenant Lease' for drug-related criminal activity that does not occur within the tenant's apartment unit when the tenant did not know of and had no reason to know of, the drug-related criminal activity." The court also found that plaintiff Walker had raised a serious question with respect to whether his eviction violated the ADA and enjoined OHA from evicting Walker on the basis of his caregiver's illegal drug use.
 
 
 21
 On appeal from the preliminary injunction, a panel of this court reversed the district court, holding that 1437d(l)(6) authorized the eviction of innocent tenants, that HUD's interpretation was consistent with the statute, and that the statute, so interpreted, was not unconstitutional. Rucker v. Davis, 203 F.3d 627 (9th Cir. 2000). We granted review en banc and vacated the panel opinion. Rucker v. Davis, 222 F.3d 614 (9th Cir. 2000). We now affirm the district court's grant of the preliminary injunction.
 
 III. STANDARD AND SCOPE OF REVIEW
 
 22
 This appeal presents the opportunity to clarify our standard and scope of review for preliminary injunctions, in particular, regarding when it is appropriate to reach the "merits" of the underlying case.
 
 
 23
 In general, we review a grant or denial of a preliminary injunction for abuse of discretion. Gorbach v. Reno, 219 F.3d 1087, 1091 (9th Cir. 2000) (en banc). The district court, however, necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact. Brookfield Communications, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1046 (9th Cir. 1999); Roe, 134 F.3d at 1402. Thus, if the district court is alleged to have relied on an erroneous legal premise in reaching its decision to grant or deny a preliminary injunction, we will review the underlying issue of law, and we do so de novo. Does 1-5 v. Chandler, 83 F.3d 1150, 1152 (9th Cir. 1996).
 
 
 24
 The scope of our review is likewise normally very narrow. We review whether the court employed the appropriate legal standards governing the issuance of a preliminary injunction and whether the district court correctly apprehended the law with respect to the underlying issues in the case. California Prolife Council v. Scully, 164 F.3d 1189, 1190 (9th Cir. 1999); Gregorio T. v. Wilson, 59 F.3d 1002, 1004 (9th Cir. 1995). We typically will not reach the merits of a case when reviewing a preliminary injunction. Roe, 134 F.3d at 1402; Gregorio T., 59 F.3d at 1004. By this we mean we will not second guess whether the court correctly applied the law to the facts of the case, which may be largely undeveloped at the early stages of litigation. "As long as the district court got the law right, `it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case.' " Id. at 1004 (quoting Sports Form, Inc. v. United Press Int'l, 686 F.2d 750, 752 (9th Cir. 1982)).
 
 
 25
 Of course, there will be cases in which the district court's interpretation of the law with respect to the underlying issues is challenged, and the resolution of such a legal question will be dispositive. If a district court's ruling rests solely on a legal question, and the facts are established or of no controlling relevance, then we may undertake a plenary review of the decision to grant a preliminary injunction. Gorbach , 219 F.3d at 1091 (citing Thornburgh v. American Coll. of Obstetricans & Gynecologists, 476 U.S. 747, 755-57 (1986), overruled in part on other grounds, Planned Parenthood v. Casey, 505 U.S. 833 (1992)).
 
 
 26
 In this case, neither party suggests that the district court applied the wrong preliminary injunction standard. HUD and OHA, however, do assert that the district court misapprehended the law with respect to the breadth of 1437d(l)(6). They contend the district court therefore based its decision on an erroneous legal interpretation, thereby abusing its discretion. Accordingly, we must turn to the proper interpretation of 1437d(l)(6), a question of law which we review de novo. See, e.g., Foti v. City of Menlo Park, 146 F.3d 629, 634-35 (9th Cir. 1998); Does 1-5, 83 F.3d at 1152.
 
 IV. SECTION 1437d(l)(6)
 
 27
 The parties agree that in interpreting 1437d(l)(6), we apply the framework set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under Chevron, the first question is whether Congress has directly spoken to the precise question at issue. Id. at 842. To determine whether Congress has spoken on the question at issue, we employ the traditional tools of statutory construction; if Congress had an intent on this issue, that intent is the law and must be given effect. Id. at 843 n.9.
 
 
 28
 In this case, a number of statutory construction principles lead us to conclude that Congress has spoken on the issue and that HUD's interpretation is contrary to congressional intent. In determining whether Congress has specifically addressed the question at issue, "a reviewing court should not confine itself to examining a particular statutory provision in isolation." FDA v. Brown & Williamson Tobacco Corp., 120 S. Ct. 1291, 1300 (2000). Rather, the "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Id. at 1301 (quoting Davis v. Michigan Dep't. of Treasury, 489 U.S. 803, 809 (1989)). When the proper interpretation of a statute is not clear from the language of the text or the broader context of the statute as a whole, the legislative history offers valuable guidance and insight into Congressional intent. United States v. Hockings, 129 F.3d 1069, 1071 (9th Cir. 1997). We will not assume that Congress intended a statute to create odd or absurd results. United States v. X-Citement Video, Inc., 513 U.S. 64, 69-70 (1994) (citing Public Citizen v. Dep't. of Justice, 491 U.S. 440, 453-455 (1989)). Finally, because we cannot presume Congress intended an unconstitutional result, whenever possible, statutes should be construed to avoid serious doubts as to their constitutionality. Id. at 78.
 
 
 29
 Because we find that Congress had an intention on the precise question at issue that is contrary to HUD's construction, HUD's interpretation is not entitled to deference. See Chevron, 467 U.S. at 843 n.9. "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Id. Thus, we do not reach the question under Chevron of whether an administrative interpretation is reasonable or permissible, for "[i]f the intent of Congress is clear, that is the end of the matter." Id. at 842.
 
 A. Textual Interpretation
 
 30
 We begin with the text of the statute. Section 1437d(l)(6) provides that "any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy." HUD essentially argues that "any " means "all," asserting that if a drug-related crime occurs by any of the enumerated individuals, then the statute clearly permits eviction of all tenants under the lease, regardless of personal involvement in or knowledge of the crime. The language of the statute, however, does not appear as plain as HUD would like it to be. The statutory provision does not expressly address the level of personal knowledge or fault that is required for eviction, or even make it clear who can be evicted. Although the statute permits "termination of tenancy," it does not answer the question of whose tenancy. In situations with multiple tenants, does the statute authorize eviction of the offending party only, or all persons on the lease?
 
 
 31
 The parties debate the significance that should be attributed to the use of the phrase "under the tenant's control." HUD argues that this phrase modifies only the term "other person" and that "control" means only that this other person has the tenant's consent to be in the tenant's unit. The tenants contend that "control" involves the "exercise of a restraining or directing influence" over another, and that this applies to all of the words in the group, i.e., household members, guests and other persons. The tenants further argue that it is implicit from the use of this wording that Congress intended tenants to be held accountable for the actions of those persons who are subject to their control, but that the statute does not impose sanctions on tenants who have taken reasonable steps to prevent criminal drug activity from occurring, but, for a lack of knowledge or other reason, could not realistically be expected to exercise control over the conduct of another.
 
 
 32
 The text of subsection (6), viewed in isolation, does not compel either party's interpretation. We therefore turn to the specific context in which the language is used and the broader context of the statute as a whole. Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997).
 
 1. Section 1437d(l)
 
 33
 In examining the language of the statute, we must look to its place in the overall statutory scheme and "fit, if possible, all parts into a harmonious whole," Brown & Williamson, 120 S.Ct. at 1301 (quoting FTC v. Mandel Bros., Inc., 359 U.S. 385, 389 (1959)). First established in 1937, the public housing program was a response to an acute shortage of "decent and safe dwellings for low-income families. " 42 U.S.C. 1437. Understanding that these low income tenants face grave adversity if evicted, Congress has put a number of protections in place that limit the ability of local PHAs to evict. In 1437d(l) itself, the local PHAs are prohibited from using leases with unreasonable terms and conditions. Another subsection also provides that the leases must not permit the PHA to terminate tenancies except for "serious or repeated violation of the terms or conditions of the lease or for other good cause." 1437d(l)(5). We believe reading section (l) as a "harmonious whole," requires us to presume that Congress also intended subsection (6) to be construed as a reasonable lease term and to permit eviction only if there is good cause.
 
 
 34
 It is, of course, our task to determine the meaning of subsection (6) and not its wisdom. Our task is to examine HUD's construction of subsection (6) in light of and in relation to the other provisions of section (l). There is undisputedly a significant problem with crime and drugs in public housing. The goal of providing safe and drug-free public housing is well served by permitting the local PHAs to evict tenants who engage in the proscribed criminal activities. It is also furthered by imposing a duty on tenants to take reasonable steps to control the drug or criminal activity of family members and guests or face eviction. There is no dispute that the eviction of tenants who personally engage in drug activity or of tenants who turn a blind eye to the activities of household members or guests falls squarely within the language of the statute under either party's reading.
 
 
 35
 While the policy considerations pointed out by the dissent may apply to the eviction of culpable tenants [Dissent at 1073-78], we do not believe they support the eviction of innocent ones. Imposing the threat of eviction on an innocent tenant who has already taken all reasonable steps to prevent third-party drug activity could not have a deterrent effect because the tenant would have already done all that tenant could do to prevent the third-party drug activity. Likewise, evicting the innocent tenant will not significantly reduce drug related criminal activity in public housing, since the tenant has not engaged in any such activity personally or knowingly allowed such activity to occur. HUD's construction of subsection (6) would allow such irrational evictions, and thus would require PHAs to include an unreasonable term in their leases and permit eviction without good cause. Read in the context of the overall statutory scheme and in light of the legislative history (discussed below), we cannot say Congress intended such a result.
 
 2. Forfeiture Provision
 
 36
 Another amendment enacted at the same time as the original version of 1437d(l)(6) also leads to the conclusion that Congress did not intend to allow the eviction of innocent tenants. In the same chapter and subtitle of the Anti-Drug Abuse Act of 1988, Congress passed both the original version of subsection (6) and also amended a pre-existing civil forfeiture provision of the Controlled Substances Act, 21 U.S.C. 881(a). The two statutes at issue were enacted together as parts of a single legislative scheme to combat drug abuse in public housing. The legislative history indicates how Congress envisioned the statutes working together:
 
 
 37
 Chapter 1 of this subtitle codifies current HUD guidelines granting public housing agencies authority to evict tenants if they, their families or their guests engage in drug-related criminal activity. It also allows the federal government to seize housing units from tenants who violate drug laws by clarifying that public housing leases are considered property with respect to civil forfeiture laws.
 
 
 38
 134 Cong. Rec. S17360-02 (Nov. 10, 1998) available at 1988 WL 182529 (Cong. Rec.).
 
 
 39
 The forfeiture provision was amended by inserting the phrase "(including any leasehold interest)" into the text of the pre-existing statute. The amended statute then read in relevant part:
 
 
 40
 The following shall be subject to forfeiture to the United States. . . .
 
 
 41
 . . . .
 
 
 42
 (7) All real property, including any right, title and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this sub chapter . . . except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.
 
 21 U.S.C. 881(a) (emphasis added).[1]
 
 43
 HUD suggests we should place no importance on the availability of what clearly was an innocent owner defense in the forfeiture provision, pointing to the differences between civil forfeiture and lease eviction proceedings. Although different animals, the Supreme Court instructs that the meaning of one statute may be illuminated by the language of another. Brown & Williamson, 120 S. Ct. at 1300-01. When dealing with two different statutes which not only govern the same subject matter but were also enacted at the same time in the same chapter of the same Act, we presume Congress meant them to be read consistently. HUD correctly points out that the forfeiture provision deals with forfeitures of the leasehold to the federal government, while 1437d(l)(6) deals with eviction by local PHAs. Although different processes, the purpose of both is the same. Moreover, the result is the same: the tenant loses the leasehold interest, which is taken over by a governmental entity. It makes little sense to provide protections for the innocent tenant from the federal government but not from local housing authorities.[2]
 
 
 44
 HUD and the dissent also argue that the forfeiture provision illustrates that Congress knows how to provide an innocent tenant defense when it wants to, and that since it did not use the very same language in 1437d(l)(6), it must not have intended for one to be available. [Dissent at 1067]. We agree that the innocent tenant defense in 881(a)(7) was more clear; it was also drafted by a different Congress than the one which enacted 1437d(l)(6), which significantly weakens HUD's argument. Cf. Lindh v. Murphy, 521 U.S. 320, 330 (1997) (negative implication argument is strongest when different provisions were joined together and considered simultaneously when the language giving rise to the implication was inserted). The concurrent amendment of 881(a)(7) did not touch the previously drafted innocent owner defense; it merely extended the forfeiture provision to include leasehold interests.
 
 
 45
 We are unpersuaded by the negative implication argument. To say Congress could have drafted the defense more explicitly in 1437d(l)(6) is not to say it did not do so at all.
 
 3. Section 1437d(c)(4)(A)(iii)
 
 46
 HUD asserts that its interpretation of 1437d(l)(6) is reinforced by a version of 1437d(c)(4)(A)(iii) which was in effect until 1996. This version prohibited individuals or families who were evicted because of drug-related criminal activity from receiving a statutory housing preference for three years, but exempted "any member of a family of an individual" who the agency determined "clearly did not participate in and had no knowledge of such criminal activity." HUD argues that if innocent tenants could not be evicted under 1437d(l)(6), there would have been no need for such an exemption, which would have rendered 1437d(c)(4)(A)(iii) surplusage.
 
 
 47
 The language HUD relies on is no longer part of the statute. We are therefore hesitant to even address an argument for harmonious interpretation when there is no longer a provision to harmonize. We do, however, note that even as originally drafted, 1437d(c)(4)(A)(iii) was not entirely inconsistent with the tenants' interpretation of 1437d(l)(6). For example, an entire family, including minor children, can be evicted under 1437d(l)(6) if the parent engages in drug-related activities. These children, upon reaching the age of eighteen, would become eligible for public housing. The prior version of 1437d(c)(4)(A)(iii) would have waived the three-year disqualification period for such children if they were not participants in the criminal activity which caused the family to be evicted, which means that this provision would not have been surplusage under the tenants' interpretation.
 
 4. Summary
 
 48
 Section 1437d(l)(6) is not a picture of clarity and may be subject to varying interpretations. When read in conjunction with the remainder of 1437d(l) and other provisions enacted at the same time, however, it appears that Congress did not intend subsection (6) to apply to the eviction of innocent tenants. Any doubts that persist about Congress's intentions, however, are firmly resolved by the legislative history and the principles of statutory construction we discuss below.
 
 B. Legislative History
 
 49
 If the intent of Congress is not clear from the language of the statute and the broader context of the statute as a whole, we consult the legislative history. Hockings, 129 F.3d at 1071. In doing so, we place particular emphasis on the committee reports accompanying the statute. Garcia v. United States, 469 U.S. 70, 76 (1984).
 
 
 50
 No House or Senate reports accompanied the original version of 1437d(l)(6), which was enacted as part of the AntiDrug Abuse Act of 1988. In 1990, however, Congress amended the provision in question, and the legislative history specifically addressed the issue before us. The Senate Report explains:
 
 
 51
 The committee anticipates that each case will be judged on its individual merits and will require the wise exercise of humane judgment by the PHA and the eviction court. For example, eviction would not be the appropriate course if the tenant had no knowledge of the criminal activities of his/her guests or had taken reasonable steps under the circumstances to prevent the activity.
 
 
 52
 S. Rep. No. 101-316, at 179 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5941. The report also addressed an identical passage in the Section 8 housing assistance program: "The Committee assumes that if the tenant had no knowledge of the criminal activity or took reasonable steps to prevent it, then good cause to evict the innocent family members would not exist." Id. at 5889.
 
 
 53
 HUD contends the legislative history indicates Congress's intent to confer wide discretion on HUD and the local PHAs. It focuses on the statement that "each case will be judged on its individual merits and will require the wise exercise of humane judgment by the PHA and the eviction court. " It is true that the PHAs have discretion in deciding whether to initiate an eviction action under the statute, but this is true whether the statute authorizes eviction of innocent tenants or not. In other words, this passage suggests that even in a case involving a "culpable" tenant, the case must be looked at on its individual merits, which may counsel against eviction, even though eviction is clearly authorized by the statute.[3]
 
 
 54
 In these reports, however, Congress specifically rejects the notion that the PHAs' discretion is so broad that it extends to the eviction of innocent tenants. These reports are very clear that such evictions would not be appropriate, and that in such circumstances good cause to evict would not exist. The latter statement is also consistent with our discussion above that 1437d(l)(6) must be read in conjunction with the good cause requirement of 1437d(l)(5). Accordingly, we reject HUD's interpretation as contrary to the clearly expressed intent of Congress. Chevron, 467 U.S. at 842-43.
 
 C. Absurd Results
 
 55
 Even if we did not find that the legislative history supports the tenants' interpretation, a number of other statutory interpretation tools would lead us to the same result. It is well established that we will not assume Congress intended an odd or absurd result. X-Citement Video, 513 U.S. at 69-70; Public Citizen, 491 U.S. at 453-55.
 
 
 56
 We need look no further than the facts of this case for an example of the odd and unjust results that arise under HUD's interpretation. HUD conceded at oral argument that there was nothing more Pearlie Rucker could have done to protect herself from eviction, but argued that the statute authorized her eviction nonetheless. HUD has also taken the position that the statute would apply and permit eviction of an entire family if a tenant's child was visiting friends on the other side of the country and was caught smoking marijuana, even if the parents had no idea the child had ever engaged in such activity and even if they had no realistic way to control their child's actions 3,000 miles away.[4] HUD also asserted the provision would apply and authorize eviction if a household member had been convicted of a drug crime years earlier, arguing that the local PHA would have the discretion to determine if eviction were warranted in such circumstances.
 
 
 57
 Although the dissent contends the Supreme Court frowns on consideration of hypothetical applications of statutes [Dissent at 1063], the Court itself has clearly looked beyond the facts of individual cases to the broader ramifications of a given interpretation when evaluating whether such interpretation creates absurd results. See, e.g. , X-Citement Video, 513 U.S. at 69. The absurdity and unjustness of the potential results in this case confirms that HUD has missed the mark in discerning Congress's intent.
 
 
 58
 The dissent also argues that because Congress has not amended 1437d(l)(6) to more clearly address the innocent tenant issue, this must mean that Congress intended these results, even if we may think them odd. [Dissent at 1070-72]. Congress's inaction, however, may cut both ways. To the extent Congress may be aware of how HUD and some courts have interpreted this provision, it must have also been aware that other courts were refusing to evict innocent tenants. See, e.g., Charlotte Hous. Auth. v. Patterson, 464 S.E.2d 68, 72 (N.C. App. 1995); Richmond Tenants Org., Inc. v. Richmond Redev. and Hous. Auth., 751 F. Supp. 1204, 1205-6 (E.D.Va. 1990). And yet, Congress did not clarify the statute. Furthermore, the One Strike policy, which has led to increased enforcement and less exercise of discretion by the PHA's, was only announced in 1996, the same year as the last substantive amendment to the section. Only now are cases beginning to surface which illustrate the breadth of HUD's interpretation and which may attract enough attention to merit reconsideration or clarification of the statute by Congress.
 
 D. Constitutional Avoidance
 
 59
 It is also a settled principle of statutory interpretation that whenever possible, a statute should be construed to avoid substantial constitutional concerns. X-Citement Video, 513 U.S. at 69. HUD's interpretation of 1437d(l)(6), however, would raise serious questions under the Due Process Clause of the Fourteenth Amendment.
 
 
 60
 Penalizing conduct that involves no intentional wrongdoing by an individual can run afoul of the Due Process Clause. Scales v. U.S., 367 U.S. 203, 224-25 (1961); Southwestern Tel. & Tel. Co. v. Danaher, 238 U.S. 482, 490 (1915). Public housing tenants have a property interest in their tenancy. Greene v. Lindsey, 456 U.S. 444, 451 (1982); Geneva Towers Tenants Org. v. Federated Mortgage Investors, 504 F.2d 483, 488-89 (9th Cir. 1974). HUD's interpretation would permit tenants to be deprived of their property interest without any relationship to individual wrongdoing.
 
 
 61
 HUD contends that the Supreme Court's decision in Bennis v. Michigan, 516 U.S. 442 (1996), forecloses any argument that depriving an innocent owner of a property right violates due process. In Bennis, a woman's husband used their jointly owned car to engage in sexual activity with a prostitute. Id. at 443. The car was forfeited and the wife contested the forfeiture on due process grounds. Id. at 446. In a 5-4 decision, the Court upheld the forfeiture, but did so narrowly on facts which are easily distinguishable from the instant case.
 
 
 62
 The Bennis Court pointed out that the proceeds from the sale did not exceed the costs of the sale so there was "practically nothing left" for Mrs. Bennis. Id. at 445; id. at 456 (Thomas, J., concurring); id. at 458 (Ginsburg, J., concurring). The Court also noted the equitable nature of the Michigan forfeiture proceeding, and that the state court had taken special note of the fact the Bennises had a second automobile. Id. at 445; id. at 458 (Ginsburg, J., concurring). In this case, there is much more at stake than a negligible financial interest in a family's second car: these families risk losing their entire property interest in their homes.
 
 
 63
 Most important, in Bennis, the Court suggested that the fact that the property was used in criminal activity was decisive; the Court held that the spouse's due process claim was defeated by "a long and unbroken line of cases hold[ing] that an owner's interest in property may be forfeited by reason of the use to which the property is put even though the owner did not know that it was to be put to such use." Bennis, 516 U.S. at 446 (emphasis added); see also id. at 450 (discussing the requirement that the property be an "instrumentality" of crime). In this case, with the exception of Plaintiff Walker's care giver, the illegal activities took place off the premises leased by the plaintiffs. Thus, the leasehold interest was not used in connection with the crime.
 
 
 64
 Justice Thomas's concurring opinion in Bennis expanded on the Court's statement that the forfeiture was justified because the property in question was an instrumentality of the crime by strongly suggesting that a due process claim exists if there has been a forfeiture of property that was not used in the commission of a crime and the owner of the property had no knowledge of the illegal activity. Id. at 455-56 (Thomas, J., concurring); see also Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 689-90 (1974). Therefore, we believe HUD's interpretation of 1437d(l)(6), which would permit the deprivation of a tenant's property interest when the property was not used in the commission of a crime and when the tenant did not know of the illegal activity, would raise serious due process questions.[5]
 
 
 65
 It is not necessary, however, to reach this constitutional issue if there is a construction of 1437d(l)(6) which avoids the question and is "not plainly contrary to the intent of Congress." X-Citement Video, 513 U.S. at 78. The tenants have proposed such a construction, by reading the use of the term "control" as a limitation on the breadth of the provision. Today we adopt that interpretation and hold that if a tenant has taken reasonable steps to prevent criminal drug activity from occurring, but, for a lack of knowledge or other reason, could not realistically exercise control over the conduct of a household member or guest, 1437d(l)(6) does not authorize the eviction of such a tenant. Cf. id. (reading "knowing" requirement of one criminal element as applying to second criminal element to avoid serious constitutional doubts); Ma v. Reno, 208 F.3d 815, 828 (9th Cir. 2000) (finding reasonable time limitation implicit in statute to avoid serious due process concerns).
 
 V. PRELIMINARY INJUNCTION
 A. APA Claim
 
 66
 The district court granted a preliminary injunction on the tenants' APA claim because it found that the tenants had raised serious questions and that the balance of hardships tipped sharply in their favor, since they could lose their homes if OHA's actions were not halted. The district court enjoined OHA from pursuing its unlawful detainer actions against Lee and Hill.[6] The district court also enjoined OHA from terminating any other leases for off-premises drug-related activity in which the tenant did not know of or have reason to know of the criminal activity.
 
 
 67
 Reviewing the interpretation of 1437d(l)(6) de novo, we have concluded that HUD's interpretation is inconsistent with Congressional intent and must be rejected. Chevron, 467 U.S. at 842-43. The question remains whether the district court properly enjoined OHA from evicting innocent tenants pursuant to paragraph 9(m) of the OHA lease. This provision was required by HUD regulations (24 C.F.R. 966.4(f)(12)(i)), which were, as discussed above, premised on HUD's erroneous interpretation of 1437d(l)(6).
 
 
 68
 Paragraph 9(m) is not an ordinary term found in residential leases and should not be treated as such. There is certainly no bargained-for-exchange in public housing leases. The form of public housing leases is almost entirely dictated by HUD. This lease provision was required by the very HUD regulations we have invalidated, and is simply the embodiment of the erroneously broad interpretation ofS 1437d(l)(6). As we discussed in section IV.A. above, such a provision would be unreasonable, and including an unreasonable term in a public housing lease is prohibited under 1437d(l), as are evictions without good cause.[7]
 
 
 69
 Accordingly, we find that the district court properly granted the preliminary injunction generally enjoining OHA from pursuing evictions under paragraph 9(m) to the extent it seeks to do so for off-premises drug-related activity in which the tenant did not know of or have reason to know of the criminal activity.[8] OHA remains free to proceed with evictions for off-premises drug activities when it can prove the tenant knew or should have known of the activity.[9] Likewise, the district court specifically permitted OHA to pursue evictions of tenants when the drug-related activity occurs within the tenant's apartment, creating a rebuttable presumption that a tenant controls what occurs in his or her unit.[10] These directives are perfectly consistent with our interpretation of "control" in 1437d(l)(6). We therefore affirm this portion of the injunction.
 
 
 70
 With respect to the portion of the injunction which enjoins OHA from pursuing its unlawful detainer actions against Lee and Hill, the facts of the underlying cases come into play. OHA, however, has not contested the assertions of Lee and Hill that they did not know or have reason to know of their grandsons' drug use. Assuming these facts are true, Lee and Hill qualify as innocent tenants. On the facts before it, the district court did not abuse its discretion by enjoining their unlawful detainer actions.
 
 B. Walker's ADA Claim
 
 71
 Plaintiff Walker presents a different situation, since the illegal drug activity occurred within his apartment, and, at least after the first violation notice, he had knowledge of the criminal activity. The district court ultimately decided to enjoin Walker's unlawful detainer action, finding that Walker had raised a serious question with respect to whether the eviction violated the ADA, and that the balance of hardships weighed in favor of permitting him to remain in his home until the ADA claim was fully litigated.
 
 
 72
 The district court noted that Walker alleged he required an in-home caregiver because of his disability and that he alleged he was not physically able to search persons entering his apartment. The district court concluded that the ADA might require some form of accommodation in the eviction policies for his situation, citing an Oregon case which required the housing authority to modify its "no dogs" policy for a hearing impaired tenant. Green v. Hous. Auth. of Clackamas County, 994 F. Supp. 1253, 1257 (D. Or. 1998). Although OHA asserted that there could be no reasonable accommodation in Walker's case because the only alternative would be a "blanket exemption" from the drug policy, the district court foundthat, based on the allegations of the complaint, it could not rule as a matter of law that no reasonable accommodation exists.
 
 
 73
 Walker's ADA claim is replete with factual questions, including whether the guests in the apartment were Walker's or the caregiver's, and whether Walker's disability prevented him from being able to search his caregiver or her guests. There are no answers to these questions at this stage of the proceedings. The district court's decision to grant the injunction on the ADA claim turns on the application of law to the facts of Walker's case. The district court applied the proper standard for issuing a preliminary injunction, and appears to have correctly apprehended the law of the ADA. We will not reverse simply because we might reach a different result on the limited facts before us. Gregorio T., 59 F.3d at 1004. A fact finder may ultimately determine that Walker cannot state a claim under the ADA or that OHA provided Walker with a reasonable accommodation by giving him two warnings and two months to find a new caregiver. On the facts before the district court at the time it made its decision, however, the district court did not abuse its discretion in entering the preliminary injunction with respect to Walker's ADA claim.
 
 VI. CONCLUSION
 
 74
 We find that Congress did not intend 1437d(l)(6) to permit the eviction of innocent tenants. Thus, HUD's contrary interpretation must be rejected. The district court therefore properly enjoined OHA from pursuing evictions based on the erroneous interpretation of 1437d(l)(6) as embodied in the OHA lease. On the limited factual record before it, the district court did not abuse its discretion in enjoining Walker's eviction with respect to his ADA claim. The grant of the preliminary injunction is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The "innocent owner" defense which then appeared in 21 U.S.C. 881(a)(7) is now codified at 18 U.S.C. 983(d) as part of the general rules for civil forfeiture procedures. In enacting 983(d), Congress clarified that an "innocent owner" is one who "(i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. 983(d)(2)(A). This continues to be consistent with our reading of 1437d(l)(6).
 
 
 [2]
 The dissent attempts to distinguish the provisions by arguing that Congress must have decided to provide substantive protections to owners that it did not provide to tenants. [Dissent at 1068]. Yet, 881(a)(7) specifically applies to leasehold interests, and the legislative history indicates Congress was specifically thinking of public housing leases when it added this provision. We cannot agree with an interpretation of 881(a)(7) that would not apply the innocent owner defense contained therein to the owners of leasehold interests. Congress's recent clarification of the innocent owner defense confirms our interpretation. 18 U.S.C.S 983(d)(6)(A).
 
 
 [3]
 HUD took the position at oral argument that an eviction court could only consider whether or not the lease term was violated, and could not review the PHAs' decision that the violation warranted eviction. This issue is not before the court today, but we note that the quoted passage suggests that eviction courts do have a role to play in evictions under 1437d(l)(6) and that the PHAs' discretion does not appear to be unchallengeable. See, e.g., Robert Hornstein, Mean Things Happening in This Land: Defending Third Party Criminal Activity Public Housing Evictions, 23 S.U.L. Rev. 257 (1996) (discussing abuse of discretion defense in PHA eviction cases).
 
 
 [4]
 We should note that the HUD regulation employs language from an earlier version of the statute, and requires that the drug activity be "on or near" the premises, thus restricting the geographical reach of the provision. 24 C.F.R. 966.4(f)(12)(i). HUD acknowledges, however, that under the amended statute, there is no such geographic limitation.
 
 
 [5]
 Several legal commentators have also recognized the potential due process problems with HUD's interpretation. See, e.g., Lisa Weil, Drug Related Evictions in Public Housing: Congress' Addiction to a Quick Fix, 9 Yale L. & Pol'y Rev. 161, 179 (1991) (vicarious liability makes HUD eviction policy both distressing and constitutionally suspect); Nelson H. Mock, Note, Punishing the Innocent: No-Fault Eviction of Public Housing Tenants for the Actions of Third Parties, 76 Tex. L. Rev. 1495, 1522-24 (1998) (noting due process problems because no relationship between liability and the action of the tenant).
 
 
 [6]
 OHA dismissed the unlawful detainer proceeding against Rucker.
 
 
 [7]
 There are also substantial constitutional considerations associated with enforcing this provision, as discussed in Section IV.D., above.
 
 
 [8]
 We undertake plenary review of this portion of the injunction because it presents a situation in which the legal issues underlying the injunction are dispositive, and the facts of the individual claims are of no controlling relevance. Gorbach, 219 F.3d at 1091.
 
 
 [9]
 The district court's injunction does not address the issue of whether tenants who have knowledge of off-premises drug activities by household members may be evicted if they attempt in good faith to prevent their household members from engaging in such activity, but are unable to do so. Accordingly, we do not consider that question here.
 
 
 [10]
 This presumption should assuage some of the dissent's concerns about the burden of proof placed on the local PHA. [Dissent at 1074-75]
 
 
 
 75
 SNEED, Circuit Judge, with whom Judges Fernandez, T.G. Nelson, and Silverman, Circuit Judges, join, dissenting:
 
 
 76
 In 1988, faced with a devastating and worsening epidemic of drug related crime and violence in public housing, Congress granted to local public housing authorities ("PHAs") a new tool in the struggle to provide decent and safe low income housing. 42 U.S.C. 1437d(l)(6) mandated that every lease entered into by a PHA include a provision permitting termination of tenancy when "a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control" engaged in "drug-related criminal activity on or near public housing premises."
 
 
 77
 In mandating this lease provision and thereby granting additional discretion to local housing authorities, Congress used unmistakably clear statutory language based on reasonable findings that such legislation was necessary and would be effective. The majority's decision reads into this statute a defense that the legislative branch rejected. Nothing in the Constitution prohibits the government from entering into reasonable lease provisions necessary to maintain the safety and structural soundness of its property. "The increase in drug related crime not only leads to murders, muggings, and other forms of violence against tenants, but also to a deterioration of the physical environment that requires substantial government expenditures." 42 U.S.C. S11901(4). Indeed, if the government is to act as a landlord, the Constitution must permit it to act as a prudent one.
 
 STANDARD OF REVIEW: CHEVRON DOCTRINE
 
 78
 Congress authorized a tenant's eviction from public housing when that "tenant, any member of the tenant's household, or any guest or other person under the tenant's control" engages in "any drug-related criminal activity, on or off such premises." The question here presented is whether this language permits local PHAs to evict tenants who were ignorant of their household members' or guests' drug use ("ignorant tenants"). The answer to this question should be that it does permit such evictions.
 
 
 79
 The Department of Housing and Urban Development (HUD), the agency charged with administering public housing, properly concluded that the statute did authorize the eviction of ignorant tenants. 24 C.F.R. 966.4(l)(1)(B); Public Housing Lease and Grievance Procedures, 56 Fed.Reg. 51,560, 51,567 (October 11, 1991). If this interpretation is a "permissible construction of the statute," then this court may not substitute its own judgment for that of HUD. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). Because the statute is clear on its face, HUD's interpretation is the only permissible construction of the statute.
 
 
 80
 The majority points out that the statute is silent on the question of a tenant's required knowledge. This alters the relevant inquiry only slightly. The majority must explain why the regulation that tracks the precise language of the statute is not reasonable. Id. at 844. In short, whether one accepts our contention that the statutory language is clear or the majority's argument that the language is silent, application of the Chevron test to the present controversy leads to the same conclusion. HUD's regulation permitting the eviction of ignorant tenants whose household members or guests engaged in drug related criminal activity on or off public housing premises is valid and enforceable.
 
 
 81
 The majority avoids the dictates of Chevron by finding that "Congress had an intention on the precise question at issue that is contrary to HUD's construction." Maj . Op. at 1039. The majority's evidence, however, is wholly insufficient to support this conclusion. We will discuss the evidence in greater detail below, but note here the gap between what the majority purports to prove and what it has in fact shown. According to the majority, the language of the statute is ambiguous. Maj. Op. at 1040.[1] The legislative history noted by the majority is equally ambiguous. It simultaneously provides discretion to local PHAs and suggests how that discretion should be exercised. "It is well established that legislative history which does not demonstrate a clear and certain congressional intent cannot form the basis for enjoining regulations." Rust v. Sullivan, 500 U.S. 173, 189-190 (1991).
 
 
 82
 The remainder of the majority's congressional intent argument flows from its holding that permitting the eviction of ignorant tenants is "unreasonable" and "absurd." This holding, however, is directly contrary to HUD's interpretation of the statute. In such a circumstance, this court should defer to HUD's judgment. It is HUD, after all, that has experience and expertise in the management of public housing. It is HUD, and not this court, that can best determine what is reasonable in the context of the public housing drug crisis.
 
 
 83
 If the majority believes HUD's construction of the statute is unconstitutional, it should say so. This court must step in when other branches of government exceed their constitutional authority. However, when this court rewrites legislative enactments and ignores the considered judgment of executive agencies -based on nothing more than the majority's understanding of what is "reasonable" or "absurd " -it is this court that has overstepped its constitutional limits.
 
 DISCUSSION
 
 84
 I. The Language, Legislative History, and Statutory Context of 42 U.S.C. S1437d(l)(6) All Show that The Eviction Provision Applies to Ignorant Tenants.
 
 
 85
 A. The Plain Language of the Statute Authorizes the Eviction of Ignorant Tenants Under 42 U.S.C. 1437(d)(l)(6)
 
 
 86
 "Where there is no ambiguity in the words, there is no room for construction." United States v. Gonzales, 520 U.S. 1, 8 (1997) (quoting United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 95-96 (1820). In the present case, the statute authorizes eviction when a "public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control" engages in "any drug related criminal activity." The majority reads into this statute the requirement that the tenant must be able to "realistically exercise control" over a household member or guest before eviction proceedings may begin. We do not believe the statute includes such a requirement. Rather, the obvious reading of the statute is to the contrary.
 
 
 87
 Under 1437d(l)(6) there are four categories of individuals whose drug related criminal activity on or near public housing property will result in the tenant's eviction. First, the tenant is responsible for his or her own drug use. Second, criminal drug activity by the tenant's household members is cause for termination.[2] Third, the tenant's guests may not engage in criminal drug activity.[3] Fourth, criminal drug activity by other persons under the tenant's control is also cause for eviction.
 
 
 88
 The structure of the statute suggests that tenants, household members, and guests are per se under the tenant's control and, therefore, the drug related criminal activity of anyone in one of these categories is cause for eviction. The tenant exercises "control" over these individuals when he or she permits them to reside in or visit the premises. No additional level of "control" is necessary. Congress's use of the disjunctive connector "or" followed by the phrase "other person " shows it intended a fourth category of "other persons" who did not fall into the three enumerated categories, but whose drug activity could nevertheless result in eviction.
 
 
 89
 The majority's reading of the statute requires that the drug user fall into two of the categories -a drug user must be both a household member/guest and under the tenant's control. See Maj. Op. p. 1040-41. But, the statute does not say this. The majority's reading renders the enumerated categories (tenants, household members, guests) superfluous."We read [the statute] with the assumption that Congress intended each of its terms to have meaning. `Judges should hesitate . . . to treat [as surplusage] statutory terms in any setting . . . .' " Bailey v. United States, 516 U.S. 137, 145 (1995) (quoting Ratzlaf v. United States, 510 U.S. 135, 140-141 (1994)).
 
 
 90
 The majority justifies its tortured reading of the statute on the grounds that enforcement of the plain language of 1437d(l)(6) would lead to absurd results. Specifically, both the district court and the majority note that the statute contains neither temporal nor geographic limitations on the drug related criminal activity. Therefore, a tenant could be evicted if that tenant's guest used drugs "five years earlier on the other side of the country." The district court reasoned that the possibility of any absurd result (even one not presented by the actual controversy) rendered the statutory language ambiguous.
 
 
 91
 This approach is untenable. It would permit the judiciary to nullify any legislative act amenable to a single absurd hypothetical construction. This approach is inconsistent with the traditional role of a court to adjudicate the specific controversy before it and to avoid speculative and general pronouncements. The Supreme Court has repeatedly rejected judicial review of hypothetical applications of statutory language. FCC v. Pacifica, 438 U.S. 726, 743 (1978) ("We will not now pass upon the constitutionality of these regulations by envisioning the most extreme applications conceivable, [citation omitted] but will deal with those problems if and when they arise."); Lindsey v. Normet, 405 U.S. 56, 65 (1972) ("[P]ossible infirmity in other situations does not render [a statute] invalid on its face."); Allen-Bradley Local No. 1111, United Electrical, Radio and Machine Workers of America v. Wisconsin Employment Relations Board, 315 U.S. 740, 746 (1942) (court will not "assume in advance that a State will so construe its law as to" make it unenforceable). The issue before the court is not whether Congress legislated a temporal nexus between the guest's drug-related criminal activity and the eviction.[4] This court must limit its review to the controversy actually presented.
 
 
 92
 The Supreme Court, in Atlantic Mut. Ins. Co. v. Comm'r of Internal Revenue, 523 U.S. 382 (1998), was asked to determine the meaning of the term "reserve strengthening" as used in the 1986 Tax Reform Act. Petitioner contended that the agency interpretation of the term was unreasonable because "in theory, it produces absurd results." Atlantic Mut. Ins. Co., 523 U.S. at 389. In support of this position, petitioner presented to the court a hypothetical example where application of the agency definition would result in manifest error. The Court refused to find the agency interpretation unreasonable. Id. at 390. It held that, despite the possibility of future error, the agency interpretation of the statute should control.
 
 
 93
 In this case, the plain meaning of the statute is not absurd. In fact, as we discuss below, see infra, the eviction of ignorant tenants whose guests engage in drug-related criminal activity is supported by a reasonable rationale based on sound public policy. It is our obligation to read the statute as it was written even while "acknowledg[ing] the reality that the reach of a statute often exceeds the precise evil to be eliminated." Brogan v. United States, 522 U.S. 398, 403 (1998).
 
 
 94
 We assume the legislative purpose is expressed by the ordinary meaning of the words used. American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982). The statute says "drug related criminal activity . . . engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy." The majority asserts that in writing this language, Congress meant to say that drug related criminal activity engaged in by any person under the tenant's control shall be cause for termination of tenancy. There is simply no support in the language for this interpretation.
 
 
 95
 B. Related Statutory Provisions and Legislative History Reveal Congressional Intent to Omit an Innocent Tenant Defense
 
 1. Related Statutory Provisions
 
 96
 Two related statutory provisions further reinforce the conclusion that 1437d(l)(6) authorizes the eviction of public housing tenants who are ignorant of their guests' drug-related criminal behavior.
 
 
 97
 a. 42 U.S.C. 1437d(c)(4)(A)(iii)[5]
 
 
 98
 42 U.S.C. 1437d(c)(4)(A), as it stood through 1996, man dated that PHAs fulfill three independent duties. First, under subsection (i), PHAs were required to allocate available housing units based on congressionally determined "preferences." Preferences were given, for example, to the homeless, to those paying more than 50% of their income in rent, and to thosewho had recently been displaced from housing.
 
 
 99
 Second, under 1437d(c)(4)(A)(iii), an individual or family otherwise eligible for preferential placement in available housing was disqualified from receiving a preference for a period of three years if evicted from public housing because of drug-related criminal activity.
 
 
 100
 Finally, the final clause of 1437d(c)(4)(A)(iii) specifically required that local PHAs waive the three year disqualification period for those individuals who "clearly did not participate in and had no knowledge of such criminal activity. " These provisions 1) established preferential tenant selection criteria; 2) disqualified those evicted because of drug activity from the established preferences for a period of three years; and 3) exempted from disqualification those evicted who "clearly did not participate in and had no knowledge of the criminal activity."
 
 
 101
 Thus, the statutory mandate imposed by 1437d(c)(4)(A) required PHAs to differentiate two classes of tenants evicted from public housing for drug-related criminal activity. The first class, to repeat, consisted of those who participated in or had knowledge of the criminal activity. These individuals were disqualified from preferential placement in available public housing units for a period of three years. The second class consisted of those individuals evicted for drug-related criminal activity who did not participate in or have knowledge of that activity. These individuals were eligible to receive preferential treatment if they satisfied one of the other criteria listed in 1437d(c)(4)(A)(i).
 
 
 102
 The distinction, between evicted tenants who "participated in" or "had knowledge of" drug-related criminal activity and those who did not have such knowledge, makes sense only if an ignorant public housing tenant could be evicted for the drug-related criminal activity of their household members or guests. Were that not so, there would have been no need for Congress to write a statute specifically waiving the applicability of the three-year prohibition period to the ignorant tenant.
 
 
 103
 b. 21 U.S.C. 881(a)(7) ("Forfeiture Statute")
 
 
 104
 This statute, 21 U.S.C. 881(a)(7), also supports a plain language interpretation of 1437d(l)(6). It is a civil forfeiture statute that makes leasehold interests subject to forfeiture when used to commit drug-related crimes.[6] 21 U.S.C. 881(a)(7) was amended concurrently with the passage of 1437d(l)(6) as part of the Anti-Drug Abuse Act of 1988. Section 881(a)(7) specifically includes a knowledge requirement. Under it, no property otherwise subject to for feiture may be seized if the owner establishes that the property was used in drug-related criminal activity "without the knowledge or consent of that owner."
 
 
 105
 The canons of statutory interpretation provide:"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)). Congress clearly perceived that forfeitures of leaseholds under 21 U.S.C. S881(a)(7) were to function differently from evictions under 42 U.S.C. 1437d(l)(6) and legislated different regimes to govern the two. Specifically, Congress recognized that the forfeiture statute permitted the government to seize property without providing any procedural protections to the owner of the property. 134 Cong. Rec. E1965-02 (1988) (use of seizure rather than eviction "cut[s] through the usual drawn-out process of first notifying the drug dealers that they would be evicted and then battling them in courts, sometimes for years, before they could be removed.") Owing to the lack of procedural protections, Congress recognized that additional substantive protections are needed to prevent the use of this weapon against undeserving parties.
 
 
 106
 Similarly, in a 1989 emergency supplemental appropriations measure, Congress directed the Secretary of HUD to issue waivers of certain administrative grievance procedures "as long as evictions of a household member involved in drug-related criminal activity shall not affect the right of any other household member who is not involved in such activity to continue tenancy." Dire Emergency Supplemental Appropriations and Transfers, Pub L. No. 101-45,S404, 103 Stat. 97 (1989). This measure, like the forfeiture statute, permits the taking of property without any pre-deprivation procedural protection. Congress, therefore, included a substantive protection for ignorant tenants. A similar substantive right, however, was not provided to tenants who received the full procedural protections offered by HUD and local PHAs.
 
 
 107
 Thus, the "innocent" owner exception in both 21 U.S.C. 881(a)(7) and Pub. L. No. 101-45 S404 reflected distinctly different congressional judgments about the proper tradeoff between procedural and substantive protections. Owners were provided substantive protections not available to tenants. Congress concluded that the forfeiture statute should not be applied to owners who did not know of or consent to the illegal use of their property. However, Congress did not afford innocent tenants the same protection. Congress determined that local PHAs should have greater discretion to evict than federal agents have to seize property of innocent owners used in drug-related criminal activity.
 
 2. Legislative History
 
 108
 Having discounted the plain language of the statute, the majority next examines the scant legislative history of 1437d(l)(6). This endeavor is both unnecessary, see supra, and unhelpful. Official legislative history consists almost entirely of a single statement in a 1990 Senate Report. The report reads in pertinent part:
 
 
 109
 The committee anticipates that each case will be judged on its individual merits and will require the wise exercise of humane judgment by the PHA and the eviction court. For example, eviction would not be the appropriate course if the tenant had no knowledge of the criminal activities of his/her guests or had taken reasonable steps under the circumstances to prevent the activity.
 
 
 110
 S. Rep. No. 101-316, at 179 (1990). Both parties make much of this statement. The government emphasizes the committee's deference to the PHA's "humane judgment, " while the tenants rely on the suggestion that eviction of ignorant tenants "would not be the appropriate course."
 
 
 111
 The committee report should be read in a manner consistent with the language of the remainder of the statute and the purposes of the Act. Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997) ("the specific context in which that language is used and the broader context of the statute as a whole " relevant to determining meaning of statutory language). It is a declared purpose of the United States Housing Act "to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs. " 42 U.S.C. 1437 (Declaration of Policy).[7] Evidence exists that 1437d(l)(6) was intended to further this purpose. During floor debate on the measure, one member of the House of Representatives commended the eviction provision as an "additional tool to enhance HUD's and the Nation's public housing managers' ability to deal with the problem of drugs in public housing." 134 Cong. Rec. 33,148 (1988) (statement of Rep. Wylie).
 
 
 112
 Read in the context of an unambiguous legislative declaration of policy, and its consistent implementation throughout the Act, the Senate committee report supports the proposition that Congress intended to provide local housing authorities with wide discretion to evict tenants connected with drugrelated criminal behavior. By permitting the eviction of ignorant as well as knowledgeable tenants, Congress deferred to the judgment of local officials who would possess a more extensive understanding of the individualized circumstances. Any suggestion by the committee as to when eviction would or would not be appropriate is properly seen as just that -a suggestion. The language is precatory and the "humane judgment" of the local agencies should control.
 
 
 113
 3. Congress Failed to Amend 1437d(l)(6) to Include an Innocent Owner Defense.
 
 
 114
 Congressional treatment of 1437d(l)(6) since its initial passage in 1988 makes clear that Congress meant what it said. Long before this litigation began, concerns about the eviction provision's applicability to ignorant tenants were expressed. In a 1989 congressional hearing, for example, the associate director of the American Civil Liberties Union (ACLU) argued that "PHAs should be restrained from imposing the sanction of eviction unless they can prove that a tenant had knowledge and actual control over the actions of a household member or third party." Drugs in Federally Assisted Housing: Hearings on S.566 Before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking, Housing, and Urban Affairs, S. Doc. No. 101-234, at 90-91 (1989). In that hearing, the ACLU brought to the attention of the committee several instances where ignorant tenants were subjected to eviction proceedings. S. Doc. No. 101-234, at 86-87; Davidson, Public Housing Aides Push to Evict Drug Users, Sometimes Violating the Rights of other Tenants, Wall St. J., Jul. 6, 1989 at A12. Congress did not respond favorably. Subsequent to this hearing, Congress amended the eviction provision, but failed to include an innocent owner exception. National Affordable Housing Act, Pub. L. 101-625, S504, 104 Stat. 4079 (1990) (substituting provisions relating to criminal activity threatening health, safety or peaceful enjoyment of other tenants for provisions relating to criminal activity generally).
 
 
 115
 Likewise, as part of the notice and comment procedure necessary for implementing its regulations, HUD received substantial criticism of the applicability of 1437d(l)(6) to ignorant tenants. "Comment by legal aid and by tenant organizations . . . alleges that the tenant should not be responsible if the criminal activity is beyond the tenant's control, if the tenant did not know or have reason to foresee the criminal conduct, . . . or if the tenant has done everything "reasonable" to control the criminal activity." 56 Fed. Reg. at 51,566 (1991). HUD nevertheless interpreted 1437d(l)(6) to grant discretion to PHAs to evict ignorant tenants. 56 Fed. Reg. at 51,567.
 
 
 116
 Subsequent to these comments and subsequent to implementation of the HUD regulations, Congress once more amended the eviction statute -and again failed to include an innocent owner exemption.[8] These inactions of Congress are highly significant. "As a matter of statutory construction, we `presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.' " United States v. Hunter, 101 F.3d 82, 85 (9th Cir. 1996) (quoting Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-185 (1988)). In Hunter, this court presumed Congress was aware of judicial decisions interpreting a criminal statute when it amended that statute many years after its initial passage. "Accordingly, the only reasonable interpretation of Congress omission of language . . . is that Congress intended [the judicial interpretation to control]." Hunter, 101 F.3d at 85.
 
 
 117
 Likewise, in this instance, Congress was aware that the administrative agency charged with implementing the eviction provision construed it to permit eviction of ignorant tenants. This interpretation had been challenged on both policy and constitutional grounds before Congress and in HUD's notice and comment procedures. Congress itself has shown its concern for ignorant tenants by protecting them with specific language in other legislative enactments. See supra.[9] Congress, however, did not provide an exemption for ignorant tenants when it amended 1437d(l)(6) in 1996. This court does not have the power to amend the statute. Congress clearly intended HUD's interpretation of the eviction statute to prevail.
 
 
 118
 II. Section 1437d(l)(6), Properly Interpreted, Does Not Conflict with 42 U.S.C. 1437d(l)(1) Prohibiting Public Housing Leases that Contain Unreasonable Terms and Conditions.
 
 
 119
 Section 1437d(l)(6) is part of a comprehensive program of legislative initiatives aimed at the public housing drug crisis. See Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, SS5101-5105 (1988); Dire Emergency Supplemental Appropriations and Transfers, Pub. L. No. 101-45,S404 (1989); 42 U.S.C. 1437d(c)(4)(A) (1990). The district court held that one aspect of the legislative response was "unreasonable" because it was "on its face . . . irrational. " The majority opinion echoes this holding. Both the district court and the majority misconceive the rationale behind the law and ignore a considered policy judgment on the part of Congress. Section 1437d(l)(6) permits, but does not mandate, eviction for all tenants whose household members or guests engage in drugrelated criminal activity. It grants discretion to PHAs to make this determination on a case-by-case basis. This was a reasonable decision on the part of Congress.
 
 
 120
 Local PHAs, it must be remembered, operate "with tax funds provided from federal as well as from state sources. The State . . . has appropriate and paramount interest and concern in seeing and assuring that the intended and proper objects of that tax-produced assistance are the ones who benefit from the aid it dispenses." Wyman v. James, 400 U.S. 309, 318-319 (1971). The district court properly defined a reasonable lease term:
 
 
 121
 The lease term must be rationally related to a legitimate housing purpose. In applying this term, the crucible of reasonableness will be defined by the particular problems and concern confronting the local housing authority. Lease provisions which are arbitrary and capricious, or excessively over broad or under-inclusive, will be invalidated.
 
 
 122
 citing Richmond Tenants Org., Inc. v. Richmond Redevelopment and Hous. Auth., 751 F.Supp. 1204, 1205-1206 (E.D. Va. 1990).
 
 
 123
 Congress confronted two interrelated problems when it passed 1437d(l)(6) permitting the eviction of ignorant tenants. First, it faced increasing drug related crime in the nation's public housing. Ample testimony before Congress demonstrated that drug use had rendered many public housing complexes unsafe and, in several instances, unlivable. 42 U.S.C. S11901(3) ("drug dealers are increasingly imposing a reign of terror on public and other federally assisted low income housing tenants.")[10] Second, Congress was confronted with increasing and understandable reluctance on the part of public housing tenants to cooperate with efforts of local PHAs to address the drug problem. "Our inability to get pushers out of the buildings rapidly enough has caused tenants to think the Housing Authority has been working against them rather than with them." 134 Cong. Rec. E1965-02 (June 14, 1988). Housing authorities were increasingly seen as "paper tigers" unable or unwilling to take decisive action against drug use in public housing. 134 Cong. Rec. at E1965-02
 
 
 124
 The ignorant tenant eviction provision rationally addresses both of these concerns. The power to evict an unknowing tenant provides the PHA with a credible deterrent against criminal activity. To require proof of knowledge on the part of the tenant of the criminal activity of a guest is impractical. Proper authorities would seldom, if ever, discover the tenant seated with the drug using guest or while the latter engaged in other drug-related criminal acts. Absent this rare factual situation, the housing authority would be forced to rely on evidence consisting of hearsay, gossip and rumor. Moreover, the lengthy public housing eviction procedure permits a culpable tenant to intimidate or threaten potential witnesses. "When suspected drug dealers were notified that eviction proceedings against them had been started, they sought to punish tenants who might have identified them." 134 Cong. Rec. E1965-02. These tactics against housing tenants have furthered the public housing drug epidemic.
 
 
 125
 In this case, for example, members of plaintiffs' household engaged in drug-related criminal activity outside the tenant's apartment.[11] Since the tenant was not with the drug-user at the time of detection, evidence that the tenant knew of the drug related criminal activity must come from either the tenant, the drug user, or other residents. Only the latter, if available, would be a reliable source of such information. For obvious reasons, PHAs will rarely secure statements from either the drug user or the tenant.
 
 
 126
 Based on substantial and credible evidence, Congress concluded that other residents were equally unlikely to present the necessary testimony. "Tenants are frightened. They are scared for themselves and their children. They are afraid to report drug incidents to the PHA management and to the police because usually nothing is done by either agency." The Drug Problem and Public Housing: Hearings Before the House Select Comm. on Narcotics Abuse and Control , H.R. Rep. No. 101-1019, at 66 (1989) (summary of testimony of Nancy Brown, Chairperson, State of Connecticut Task Force on Public Housing and Drugs); "The fear of retaliation makes it almost impossible to provide normal police protection." H.R. Rep. No. 101-1019, at 69 (summary of testimony of Vincent Lane, Chairman, Chicago Housing Authority).
 
 
 127
 By granting PHAs the authority to evict tenants without proving the tenant knew of the drug-related criminal activity, Congress passed reasonable legislation designed to address these well-documented obstacles to effective law enforcement. Residents of public housing are empowered by 1437d(1)(6) to monitor and report drug activity without fearing the possibility of retaliation. This will reduce the need for residents to confront drug dealers in court in order to prove the tenant knew of the drug-related criminal activity and secure their eviction. "Once tenants realize that they can rejoin the fight against drug dealers without fear of retaliation, we will have achieved an important victory." 134 Cong. Rec. E1965-02 (article written by Emmanuel P. Popolizio, Chairman, New York City Housing Authority).
 
 
 128
 Much of the public housing drug eradication program was aimed at obtaining the cooperation and support of public housing tenants. HUD Secretary Jack Kemp, for example, recommended that PHAs establish anonymous `drug tip' hotlines "so that residents can anonymously report drug activity in their area." H.R. Rep. No. 101-1019, at 64 (testimony of Jack Kemp, Secretary of HUD). Like the anonymous hotline, 1437d(l)(6) was a reasonable response to the legitimate housing objective of reestablishing tenant control of drug-ridden public housing units. Mayor James P. Moran Jr. of Alexandria, Virginia argued before a Senate subcommittee that the eviction provision was critical to "giv[ing] a sense of control back to the tenant leadership within the communities." Drugs in Federally Assisted Housing: Hearings on S.566 Before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking, Housing, and Urban Affairs , S. Doc. No. 101-234, at 27 (1989).
 
 
 129
 Furthermore, a provision permitting the eviction of unknowing tenants because of the wrongdoing of their household members or guests is a common and enforceable provision in leases between private owners of property and their tenants. Shepard v. Dye, 137 Wash. 180 (1926) (eviction upheld even though lessee neither knew of nor consented to the gambling activity engaged in by sub-lessee); Minnesota Public Hous. Auth. v. Lor, 591 N.W. 2d 700, 704 (1999) ("A lease is a form of contract. Unambiguous contract language must be given its plain and ordinary meaning, and shall be enforced by courts even if the result is harsh."[citations omitted]); 56 Fed. Reg. at 51,566 (Oct. 11, 1991) (The "ability of PHA or other landlord to enforce covenants relating to acts of unit residents . . . is a normal and ordinary incident of tenancy.") The regular use and enforcement of these provisions among private parties attests to their reasonableness.
 
 
 130
 The fact that one of the parties to this particular lease was a government agency does not render an otherwise prudent provision unreasonable.[12] Frequently, governments impose liability on individuals without requiring that the individual had actual knowledge of the wrongdoing. See Conn. Gen. Stat. S52-572 (imposing tort liability on "ignorant" parents for actions of their children); 42 U.S.C. 9607 (property owner liable for environmental cleanup when waste was legally deposited by a previous owner without current owner's knowledge or consent).
 
 
 131
 Thus, it must be acknowledged that the congressional imposition of liability without fault on individuals is not, per se, unreasonable. Such liability, furthermore, is frequently negotiated between private landlords and tenants. Congress, by enacting 1437d(1)(6), determined that the safety and security of public housing tenants justified the potential eviction of ignorant tenants. Housing Lease and Grievance Procedures, 56 Fed. Reg. at 51,567 ("Congress has determined that drug crime and criminal threats by public housing household members are a special danger to the security and general benefit of public housing residents warranting special mention in the law.") This determination was entirely reasonable.
 
 
 132
 III. The Constitution Does Not Prohibit the Eviction of Ignorant Tenants from Federally Subsidized Housing.
 
 
 133
 Section 1437d(l)(6) is not proscribed by the Constitution. In evicting Walker, Lee and Hill[13] for the actions of their household members and guests, the Oakland Housing Authority was exercising its right to terminate tenancy because of a violation of the lease. As noted above, this is not an unusual provision.[14] The fact that the landlord in this case was a government agency should not transform an otherwise proper eviction into a constitutional question.
 
 A. Constitutional Doubt
 
 134
 The majority does not reach the constitutional issues raised by the tenants in this case. Rather, applying the doctrine of "constitutional doubt," the majority instead imposes its own construction on the statute. The majority, however, has misapplied this doctrine. "The `constitutional doubt' doctrine does not apply mechanically whenever there arises a significant constitutional question the answer to which is not obvious." Almendarez-Torres v. United States, 523 U.S. 224, 239 (1998). The doctrine is to be applied only when 1) the statute is "genuinely susceptible to two constructions " and 2) there is a "serious likelihood" that the statute will be held unconstitutional. Id. at 238; United States v. Jin Fuey Moy, 241 U.S. 394, 401 (1916) (Holmes, J.) (statute must be construed so as to avoid "grave doubts" as to its constitutionality). We have already articulated the reasons we do not believe the statute is susceptible to multiple interpretations. We would also hold that the statute, as written by Congress and implemented by HUD, is constitutional.
 
 B. Due Process
 
 135
 Government plays many parts. When it acts in one of its many proprietary roles (employer, purchaser, or landlord, to name a few), it must be able to enforce reasonable and germane conditions. National Endowment for the Arts v. Finley, 524 U.S. 569, 587-588 (1998) ("[T]he Government may allocate competitive funding according to criteria that would be impermissible were direct regulation . . . or a criminal penalty at stake.") A government employer, for example, may impose restraints on employee speech that would violate the First Amendment if imposed on an ordinary citizen. Pickering v. Bd. of Educ. Of Township High School Dist. 205, Will County, Illinois, 391 U.S. 563, 568 (1968) (applying intermediate rather than strict scrutiny to dismissal of public school teacher for exercising First Amendment rights). Likewise, when the government acts to subsidize a purchase of certain services but not others, there may be no constitutional implications. Maher v. Roe, 432 U.S. 464, 475 (1977) (subsidizing childbirth, but not abortion "does not interfere " with a fundamental right, but merely "encourages" childbirth).
 
 
 136
 When managing a public housing complex, the government's role is not unlike that of an employer or purchaser. The constitution does not require the government to provide decent and safe housing to its citizens. Lindsey , 405 U.S. at 74 (there is no "constitutional guarantee of access to dwellings of a particular quality.") The rights provided in the Housing Act of 1937 and its subsequent amendments arise from congressional notions of sound policy not constitutional necessity. In furtherance of such policy, Congress should be accorded considerable flexibility in fixing the necessary rules with which beneficiaries must comply.
 
 
 137
 In this case, Congress has limited the right to reside in public housing to those individuals who agree to accept responsibility for the drug-related criminal activity of their household members and guests. It has granted to PHAs the authority to withdraw this benefit from those who will not or cannot prevent their guests from engaging in such activity. So long as this condition is relevant to the government's underlying interest as a landlord, it is constitutionally permissible. Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 836 (1987) (if governmental purpose is sufficient to justify outright refusal of benefit, it is sufficient to justify conditions on that benefit). See also Dandridge v. Williams, 397 U.S. 471 (1970).
 
 
 138
 In Lyng v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers of America, UAW ("UAW"), 485 U.S. 360 (1988), the Supreme Court upheld the denial of food stamps to an entire household because a single member of that household was on strike. Like the tenants in the present case, the appellees in UAW argued that the statute unconstitutionally burdened the right to association because it "impermissibly directs the onus of the striker's actions against the rest of the family." UAW, 485 U.S. at 363.
 
 
 139
 The denial of food stamps undoubtedly imposed a hardship on "innocent" family members. So long as non-striking family members continued to share their household with a striker, they were prohibited from enjoying a government benefit to which they were otherwise entitled. Although the Court recognized that associational rights were implicated by the food stamp statute, it held that the "withdrawal of a government benefit" did not pose a significant danger to the exercise of that constitutional right. Id. at 367 n.5.
 
 
 140
 In UAW, the Court also acknowledged that the means used by Congress in addressing this objective were imperfect because the "statute works at least some discrimination against strikers and their households." Id. at 371-2 ("in terms of the scope and extent of their ineligibility for food stamps, 109 is harder on strikers than voluntary quitters.") Nevertheless, the Court deferred to the congressional view of "what constitutes wise economic or social policy" and upheld the statute. Id. at 372 (quoting Dandridge v. Williams, 397 U.S. at 486.)
 
 
 141
 Similarly, in Lipscomb v. Simmons, 962 F.2d 1374 (9th Cir. 1992) (en banc), this court upheld a state's foster care funding scheme against a constitutional challenge. The court noted that it must defer to the legislatively determined allocation of scarce child care subsidies. "Because Oregon has no affirmative obligation to fund plaintiffs' exercise of a right to maintain family relationships free from governmental interference, we decline to apply heightened scrutiny." Lipscomb, 962 F.2d at 1379. Because the allocation of welfare payments is a legislative function, a court may not strike down such schemes on the basis of "seemingly arbitrary consequences in some individual cases." Id. at 1382 (quoting Califano v. Jobst, 434 U.S. 47, 53 (1977)). Rather, when confronted with a facial challenge to a statutory determination of eligibility, the Lipscomb court limited its inquiry to "only whether there is a rational basis for the program viewed as a whole." Id . Consequently, despite the potential for "unfavorable results in the cases of individual plaintiff[s]," the statutory scheme was constitutional because it was rationally related to the government's interest in "maximizing the amount of money available" for the program as a whole. Id. at 1380, 1381.
 
 
 142
 In this case, the government has interrelated interests. Both reclaiming public housing from an epidemic of drug related crime and violence and empowering public housing residents to assist in this effort are indisputably legitimate objectives. The failure to distinguish between the knowing and unknowing tenant need survive only minimal scrutiny. In determining who may reside in federally subsidized housing, Congress must draw distinctions "in order to make allocations from a finite pool of resources." UAW, 485 U.S. at 373. See also Wyman v. James, 400 U.S. 309 (1971) (holding that the government may condition welfare payments on a recipients agreement to permit warrantless home visits by agency personnel).
 
 
 143
 Section 1437d(l)(6) facilitates the eviction of truly culpable tenants, creates incentives for all tenants to report drug-related criminal activity, and provides a credible deterrent against criminal activity. Because the eviction provision is discretionary, the provision also motivates tenants to accept remedial actions short of eviction. HUD, One Strike and Your Out Policy in Public Housing, 8 (March 1996).[15] The statute is, therefore, rationally related to Congress' legitimate objectives. No more is required. Ohio Bureau of Employment Servs. v. Hodory, 431 U.S. 471, 491 (1977) (statute that "provides only rough justice . . . is [nevertheless] far from irrational.")
 
 
 144
 The majority opinion ignores the discretionary nature of the benefit at issue and instead focuses on the property rights of those who currently reside in federally subsidized housing. The majority finds "grave doubt" as to the constitutionality of 1437d(l)(6) because the statute authorizes eviction "without any relationship to individual wrongdoing." The majority's analysis flounders, however, because the Supreme Court has repeatedly held that "the innocence of the owner of property subject to forfeiture has almost uniformly been rejected as a defense." Bennis v. Michigan, 516 U.S. 442, 449 (1996) (quoting Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 683 (1974)); See also, J.W. Goldsmith, Jr. Grant Co. v. United States, 254 U.S. 505 (1921); Van Oster v. Kansas, 272 U.S. 465 (1926).
 
 
 145
 The majority argues that this unbroken line of authority is factually distinguishable from the present case. Specifically, the majority hangs its constitutional argument on the fact that two tenants face eviction for drug related criminal activity that took place on public housing premises but not in the tenant's apartment. This is a thin reed on which to hang "grave doubts" as to the constitutionality of 1437d(l)(6). The "cases authorizing [forfeiture of the property of innocent owners] are `too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced.' " Bennis , 516 U.S. at 452. (quoting Goldsmith-Grant, 254 U.S. at 511). The facts of this case present no reason to create a new constitutional rule. Those who engaged in drug-related criminal activity were on the premises with the consent of the tenants. No additional nexus among the tenant, property, and the drug use is constitutionally required.
 
 C. Excessive Fines
 
 146
 The tenants' contention that the lease provision permitting eviction of ignorant tenants is an excessive fine proscribed by the Eighth Amendment is without merit.[16] No court has held that government enforcement of a valid lease provision constitutes an excessive fine. To do so would be to "federalize the substantive law of landlord-tenant relations." Lindsey, 405 U.S. at 68. Excessive fines analysis is limited to those circumstances where "the government . . . extracts payments, whether in cash or in kind, `as punishment for some offense.' " United States v. Bajakajian , 524 U.S. 321, 328 (1998) (quoting Austin v. United States, 509 U.S. 602, 609610 (1993)).
 
 
 147
 The eviction of a tenant for violation of a valid lease provision is distinguishable from a cash payment to the government. In Kim v. United States, 121 F.3d 1269 (9th Cir. 1997), a grocery store owner sought review of his permanent disqualification from participation in the federal food stamp program. The basis for the disqualification was that an employee -without plaintiff's knowledge or consent -illegally exchanged cash for food stamps. Id. at 1271. The owner insisted that permanent disqualification constituted an excessive fine in that there was no evidence of individual wrongdoing on his part. The court rejected this argument."Permanent disqualification . . . is not an excessive fine prohibited by the Eighth Amendment because it is not cash or in kind payment directly imposed by, and payable to, the government. " Id. at 1276.
 
 
 148
 Eviction from publicly subsidized housing is comparable. Eviction is the return of a possessory right to its original owner, the government. The government then transfers the possessory right to another citizen under the same conditions as it was held by the original tenant. The purpose behind the excessive fines clause -to limit the government's power to enrich itself by punishing its citizens -is absent in the case of eviction from public housing. See Browning-Ferris Industries of Vt. Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 264-268 (1989). Evictions cannot properly be characterized as "cash or in kind payments" and should not be subject to excessive fines analysis.
 
 
 149
 Moreover, evictions in these circumstances are not punitive. They are remedial. A civil sanction is punitive when it serves "either retributive or deterrent purposes. " Austin, 509 U.S. at 610. Eviction serves the classic purpose of a contractual remedy -it returns the parties to "as good a position as that occupied . . . before the contract was made. " Corbin on Contracts S996. The remedy of eviction alone is not punitive. Therefore, the Eighth Amendment prohibition of excessive fines is inapplicable in this case.
 
 
 150
 IV. The ADA Does Not Prevent the Eviction of Mr. Walker.
 
 
 151
 In addition to the statutory and constitutional claims raised by all tenants, one tenant, Mr. Walker, raises an additional claim under the Americans with Disabilities Act ("ADA") 42 U.S.C. 12101, et seq. Walker argues that the ADA prevents his eviction despite the fact that his caretaker and other guests engaged in drug-related criminal activity in his apartment and on the premises on at least three occasions.
 
 
 152
 The district court enjoined the unlawful detainer proceedings against Walker. The court held that the eviction provision of the lease placed Walker "at more risk for forfeiture of his tenancy than other tenants who do not require in home care." While non-disabled tenants can comply with the lease provision simply by "choosing not to have any household members or guests," Mr. Walker -because of his disability -does not have that choice. He requires an in home caretaker. Consequently, the district court concluded that the ADA may require the OHA to provide some accommodation exempting Walker from responsibility for the drug-related criminal activity of his caretaker.
 
 
 153
 The district court erred, however, because the OHA did not seek to evict Mr. Walker based solely on the drug-related criminal activity of his caretaker. Whether there is a "reasonable accommodation" that would permit Mr. Walker to engage the services of a drug-using caretaker without risk of eviction was not presented by the facts of this case. Consequently, although the district court applied the appropriate standard to a request for preliminary relief, it "misapprehend[ed] the law with respect to the underlying issues in litigation." Sports Form, Inc. v. United Press Int'l, Inc., 686 F.2d 750, 752 (1982). This constitutes reversible legal error.
 
 
 154
 The unlawful detainer complaint against Mr. Walker alleged three separate incidents of drug-related criminal activity in Mr. Walker's apartment and/or by his guests. Only one of those incidents involved Mr. Walker's caretaker. On August 7, 1997, the OHA contends that it stopped and searched a guest of Mr. Walker on OHA premises. The guest was in possession of crack cocaine. Mr. Walker does not claim that this guest was employed as his caretaker. After arresting Walker's guest, officers went to Walker's unit where Walker consented to a search. There officers met Eleanor Randle. Ms. Randle had a cocaine pipe pinned inside her jacket. She was arrested for possession of narcotics paraphernalia. Mr. Walker alleges that Ms. Randle is his caretaker. Officers also found a cardboard box containing crack cocaine pipes and "suspected rock cocaine chips." OHA did not ascertain the ownership of these drugs found in Walker's apartment. Mr. Walker denied knowledge of all criminal drug activity that took place in his apartment.
 
 
 155
 On August 12, 1997 officers found a cocaine pipe inside a bag of hair rollers inside Walker's apartment. Walker's alleged caretaker, Eleanor Randle, was not present at the time, although another guest was.
 
 
 156
 On October 11, 1997 officers again found a cocaine pipe in Walker's apartment. Walker's guest at the time was cited for possession of narcotics paraphernalia. Walker does not allege that this guest was his caretaker.
 
 
 157
 Under 1437d(l)(6) any one of these incidents, if proven, is sufficient justification for Mr. Walker's eviction. Under the district court's reasoning, Mr. Walker requires a "reasonable accommodation" only because he cannot, like a non-disabled resident, choose not to have guests. He must permit a caretaker to enter his apartment. This reasoning cannot sustain an accommodation that exempts Walker from eviction for the drug-related criminal activity of non-caretaker guests. There are two alleged incidents of such conduct.
 
 
 158
 On appeal of a preliminary injunction, we do not accept the housing authority's allegations as true. The accuracy of these allegations should be determined through the normal adjudication of the pending unlawful detainer action. We only believe that even assuming Mr. Walker is disabled and assuming that a reasonable accommodation could be found that would prevent the eviction of Mr. Walker because of the drug-related criminal activity of his caretaker, Mr. Walker could still be evicted based on the drug possession of his other guests who were not his caretakers. Mr. Walker's ADA claim should therefore be rejected.[17]
 
 CONCLUSION
 
 159
 It is obvious that when Congress authorized the eviction of innocent tenants, the potential for individual unfairness existed. Congress granted to local PHA's the power to evict and trusted that the "humane judgment" of PHA officials and the procedural protections of the Act would prevent the abuse of this power. Congress struck a balance. It did so in the face of a drug crisis and the ineffectiveness of traditional law enforcement. It bestowed upon the PHAs the authority challenged in this case. That authority does not violate the Constitution. This legislation should be interpreted as it was written.
 
 
 
 Notes:
 
 
 [1]
 Indeed, the doctrine of constitutional doubt, on which the majority relies, is only applicable when a statute is ambiguous.
 
 
 [2]
 HUD defines "members of the household" as those individuals who are listed as such by name on the lease. 24 C.F.R. 966.4(a)(2).
 
 
 [3]
 HUD defines a "guest" as "a person in the leased unit with the consent of a household member." 24 C.F.R. 966.4(d)(1)
 
 
 [4]
 Were that the issue, we might be required to analyze this case under the second prong of the Chevron doctrine (i.e. determine if HUD's interpretation of this provision is reasonable).
 
 
 [5]
 42 U.S.C. 1437d(c)
 (4) the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to--
 (A) . . . the establishment of tenant selection criteria which--
 (i) . . . give preference to families that occupy substandard housing (including families that are homeless or living in a shelter for homeless families), are paying more than 50 percent of family income for rent, or are involuntarily dis placed . . . at the time they are seeking assistance under this chapter.
 . . .
 (iii) prohibit any individual or family evicted from housing assisted under the chapter by reason of drug related criminal activity from having a preference under any provision of this subparagraph for 3 years . . . except that the agency may waive the application of this clause under standards established by the Secretary (which shall include waiver for any member of a family of an individual prohibited from tenancy under this clause who the agency determines clearly did not participate in and had no knowledge of such criminal activity . . .). (emphasis added)
 
 
 [6]
 21 U.S.C. S881(a)(7) provides:
 The following shall be subject to forfeiture to the United States and no property right shall exist in them:
 (7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.
 
 
 [7]
 This policy judgment is reflected throughout the Act. Local authorities,for example, have the responsibility to determine the public housing needs in their community. 42 U.S.C. 1437c(e). See also, 42 U.S.C. 1437d(c)(4)(A).
 
 
 [8]
 In fact, in the 1996 amendment to 1437d(l)(6), Congress expanded the provision such that an ignorant tenant could be evicted for drug-related criminal activity that took place "on or off" public housing premises, rather than simply "on or near" the premises as the legislation had previously read. Pub L. No. 104-120, S9(a)(2), 110 Stat. 836 (1996).
 
 
 [9]
 21 U.S.C. 881(a)(7) protects owners from forfeiture when they did not know nor consent to the illegal use of their property. 42 U.S.C. 1437d(c)(4)(a)(iii) protected ignorant public housing tenants from disqualification from future placement. Pub L. No. 101-45, S404 provided ignorant tenants with additional procedural protections not available to those tenants who were aware of the drug-related criminal activity of their guests.
 
 
 [10]
 One resident of public housing described living conditions in the following terms.
 "At night, when people are trying to rest, hallways are being used [for smoking crack], stairwells are being slept in, elevators are being mutilated with people using them for personal bathrooms . . . . There is crack being sold openly."
 Just Saying No is not Enough: HUD's Inadequate Response to the Drug Crisis in Public Housing, H.R. Rep. No. 100-702, at 4 (1988).
 
 
 [11]
 Mr. Walker's guest was found in possession of drugs inside of Walker's apartment.
 
 
 [12]
 Whether the lease provision is "reasonable" within the meaning of 1437d(l)(1) is a separate question from whether the constitution permits the government to include it in every public housing lease. We deal with the constitutional questions below.
 
 
 [13]
 In an exercise of its "humane judgment," the OHA has decided not to seek the eviction of plaintiff Rucker.
 
 
 [14]
 "Were we dealing with the same lease provision in a lease between private parties we could have affirmed the [eviction] in one short paragraph relying solely on the lease provision." Hous. Auth. of New Orleans v. Green, 657 So.2d 552, 555 (La. App. 1995).
 
 
 [15]
 Even though the "one strike " policy was implemented eight years after the passage of 1437d(l)(6) it still may offer a legitimate rationale for the passage of the statute. Antonio v. Wards Cove Packing Co., 10 F.3d 1485, 1494 (9th Cir. 1993) ("A rational basis need not be one that actually motivated Congress. It is enough that plausible reasons for Congress' action exist." [citations omitted])
 
 
 [16]
 "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const., amend. 8.
 
 
 [17]
 We also note that the OHA did accommodate Mr. Walker by not attempting to evict him until after the third drug-related criminal offense committed by one of his guests. OHA is not required by the ADA to provide Walker with an accommodation that is not reasonable. Memmer v. Marin County Courts, 169 F.3d 630, 633-634 (9th Cir. 1999). A request to waive applicability of 1437d(l)(6) to a tenant's caretaker is not reasonable.