**HOUSING AUTHORITY OF THE CITY OF PITTSBURGH,**
Appellant,

v.

**Marcella FIELDS.**

Commonwealth Court of Pennsylvania.

Argued Feb. 7, 2001.
Decided March 28, 2001.

Irving Firman, Pittsburgh, for appellant.

Mary Ellen Droll, Pittsburgh, for appellee.

Before DOYLE, President Judge, COLINS, Judge, McGINLEY, Judge, PELLEGRINI, Judge and FRIEDMAN, Judge.

McGINLEY, Judge.

The Housing Authority of the City of Pittsburgh (Authority) appeals from an order of the Court of Common Pleas of Allegheny County (trial court) that denied the Authority's motion for removal of a non-suit.[1]

On November 15, 1996, the Authority leased a unit located at 338 Elmore Square in the housing community known as Addison Terrace[2] to Marcella Fields (Fields). Section 1B of the Lease stated that the premises were for the exclusive use by Fields and the household members she listed: Marcella Fields, mother, Herkley Fields, son born 12/30/66, Andre Fields (Andre), son born 7/10/75, and Shaquela

Fields, granddaughter born 7/7/85. Fields was required to pay rent of $50 per month based upon one-third of the total income earned by all of the residents in the unit.

Paragraph 8(I) of the Lease provides:
Tenant shall not engage in and shall prevent any Household Member or guest under the Tenant's control from engaging in:

(1) Any drug related criminal activity, including but not limited to, the presence of an illegal controlled substance in the unit or adjacent to the premises. The physical presence of the controlled substance rather than actual ownership of the drugs shall constitute a material breach of this agreement and amounts to grounds for immediate lease termination in compliance with Pennsylvania law.

(2) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of HACP [Authority] property by other Tenant or employees of Management.

Paragraph 13 of the Lease, entitled "Default by Tenant" provides in pertinent part that a tenant shall be in default if:

(2) Tenant, Household Member or guest neglects or fails to perform any of the promises, terms, provisions or conditions contained in this Lease, especially as it relates to the tenant's Obligations contained in paragraph 8 of this lease.

On March 14, 1998, Andre was arrested and charged with possession of a controlled substance and possession of a controlled substance with intent to deliver and resisting arrest. This activity occurred in the courtyard immediately in front of

1. Currently, there is a vacancy among the commissioned judges of this Court. Consequently, an even number of commissioned judges voted on this *en banc* opinion, and a tie vote resulted. Therefore, this opinion is filed as circulated pursuant to Section 256(b) of the Internal Operating Procedures of the Commonwealth Court, 210 Pa.Code § 67.29(b).

2. Addison Terrace consists of 800 units which serve as the residences of approximately 680 families and senior citizens.

Fields' unit. He was convicted on February 1, 1999.

On May 8, 1998, the Authority hand-delivered a notice of termination to Fields. The notice stated that a serious violation of a material term of the Lease had occurred because a member of her household was involved in drug-related criminal activity in the immediate vicinity of her unit. When Fields failed to vacate the premises, the Authority initiated the present landlord-tenant action on June 5, 1998, with a district justice. On June 17, 1998, the district justice entered judgment in favor of Fields. The Authority appealed to the trial court. On September 17, 1998, a board of arbitrators entered an award of possession in favor of the Authority. Fields appealed this decision to the trial court.

On August 31, 1999, the trial court conducted a bench trial. Todd Waller (Waller), police officer for the Authority, testified regarding the arrest of Andre. Notes of Testimony, August 31, 1999, (N.T.) at 7–10; Reproduced Record (R.R.) at 138a–142a. On cross-examination, Waller admitted that Fields was not present at the time of Andre's arrest and was not arrested. N.T. at 14–15; R.R. at 146a–147a.

Harriet Waller–Jethroe (Waller–Jethroe), property manager for the Authority at Addison Terrace, testified that Fields initialed the paragraphs of the Lease addressing drug-related criminal activity and that the provisions were read to her aloud. N.T. at 20–21; R.R. at 152a–153a. Waller–Jethroe testified that Andre was a Household Member in Fields' unit. She further testified that Fields paid $50.00 per month in rent which was ⅛ of her actual income, which was also an indication that her sons had no income.

Richard Morris (Morris), project manager for the Authority, testified that he coordinated the activities of the Authority's criminal activity review process. Accord-ing to Morris, Authority police report each incident and arrest on Authority property. N.T. at 30; R.R. at 162a. Morris testified the criminal activity review panel (review panel) reviewed each case to determine whether to evict. Morris testified the review panel decided to evict Fields and her family to reduce drug activity and because of the large amount of cocaine in Andre's possession. N.T. at 32–33; R.R. at 164a–165a.

At the conclusion of Morris' testimony, Fields' attorney moved for a non-suit on the basis that the Authority failed to shoulder its burden to prove that Fields engaged in a material breach of the Lease because the Authority did not establish that Fields had knowledge of her son's activities or that she reasonably should have anticipated her son's activities on March 14, 1998. The trial court granted the motion for a non-suit. The Authority moved for removal of the non-suit. The trial court denied the motion and reasoned:

> In any event, it is undisputed that 'control' over the Household Member is an issue at some point. The Court's conclusion that it is part of Plaintiff's [Authority] *prima facie* case is based on the fact that leases are contracts. The mere fact that the provision in question attempts to comply with the federal funding regulations regarding public housing does not bring the lease outside the realm of contract law. Under well-settled contract law principles, the Plaintiff always has the burden of proving both the contract *and* the breach.

> In the instant case, there is no contention that Mrs. Fields herself was anything other than a model tenant. There is no contention that she had any reason to suspect that her son would engage in illegal conduct. Furthermore, under the undisputed wording of the lease in question, there is *no* breach unless the per-

son whose conduct is at issue, Mrs. Fields' adult son, is shown to be 'under the Tenant's control.' Under the law of Pennsylvania, adults are not returned to their parents' control simply by living with them. Plaintiff [Authority] presented no other evidence to suggest that this adult son was different from all other adult children.

Plaintiff's [Authority] sole basis for asserting a breach is that Mrs. Fields is the mother of an adult son, not shown to have been under her control, who engaged in drug-related activity while living in Mrs. Fields' home which she rented from Plaintiff [Authority]. Plaintiff [Authority] could certainly evict or bar the adult son from Mrs. Fields' home. However, in order to remove Mrs. Fields herself from the apartment, Plaintiff [Authority] must present a *prima facie* case that there was a breach of the lease *by Mrs. Fields*. Since evidence of all the elements necessary to prove that *she* breached the lease was not presented, the Court properly entered a non-suit and properly refused to lift it for the same reason. (Emphasis in original).

Trial Court Opinion, March 30, 2000, at 2–3.

■■■ The Authority contends that it presented evidence from which a reasonable factfinder could infer that Andre was under the control of Fields and, in the alternative, that the Authority is not required to prove that a Household Member is "under the control" of the tenant.[3]

■■■ A non-suit may be entered only when a plaintiff is unable to recover under any view of the evidence and where every doubt is resolved against its entry and all inferences are drawn most favorably to the plaintiff. The trial court must give the plaintiff the benefit of all favorable testimony and all reasonable inferences drawn from that favorable testimony. *Hightower–Warren v. Silk*, 548 Pa. 459, 698 A.2d 52 (1997).

■■■ The Authority contends that it was not required to prove that Andre was under his mother's control in order to evict Fields.[4] The Authority asserts that under the Anti–Drug Abuse Act of 1988 and subsequent amendments, Congress amended the United States Housing Act of 1937 to state:

Each public housing agency shall utilize leases which ....

(5) provide that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or near such premises by other tenants or any drug related criminal activity on or near such premises, engaged in by a public housing tenant, *any member of the tenant's household,* or *any guest or other person under the tenant's control,* shall be cause for termination of tenancy. (Emphasis added).

42 U.S.C. § 1437d($l$)(5).[5]

Further, the Department of Housing and Urban Development regulation on ten-

---

**3.** In reviewing a trial court's refusal to remove a non-suit, this Court must assess the evidence in the light most favorable to the appellants, resolving every conflict in their favor, and giving them the benefit of every reasonable inference. *Marlowe v. Lehigh Township,* 64 Pa.Cmwlth. 587, 441 A.2d 497 (1982).

**4.** We have foregone the sequence of the Authority's arguments.

**5.** In 1998, 42 U.S.C. § 1437d($l$)(5) was unchanged but was redesignated as 42 U.S.C. § 1437d($l$)(6).

ant obligations, 24 C.F.R. § 966.4(f)(12)(i)(B) provides:

> To assure that the tenant, any member of the household, a guest, or another person under the tenant's control, shall not engage in:....
>
> (B) Any drug-related criminal activity on or near such premises. Any criminal activity in violation of the preceding sentence shall be cause for termination of tenancy, and for eviction from the unit.

The Authority also contends that the term "under the tenant's control" in the Lease only refers to guests not household members and that if any household member engages in the prohibited activity it is grounds for eviction.

In *Delaware County Housing Authority v. Bishop,* 749 A.2d 997 (Pa.Cmwlth.2000), this Court addressed a similar issue. Barbara Bishop (Bishop) resided in the Upland Terrace Public Housing Development (Terrace) in Delaware County with her two adult sons, Nathaniel Bishop and Ralph Walters. Nathaniel, though listed on the lease, did not reside at his mother's residence for some time until moving back on September 17, 1995, after a fight with his girlfriend. Five days later, Nathaniel robbed and raped a sixty-eight year old woman who also lived in the Terrace. Nathaniel was convicted of burglary, robbery, rape, unlawful restraint and theft by unlawful taking or disposition and was sentenced to serve a prison term of thirteen years and four months to thirty years. *Bishop,* 749 A.2d at 998–999. On October 5, 1995, as a result of the robbery and rape, the Upland Borough Police Department executed a search warrant of Bishop's apartment. The search uncovered cocaine and marijuana which belonged to Ralph Walters, then thirty-two years old. Walters pleaded guilty to drug possession and was placed into the Accelerated Rehabilitative Disposition Program. As a result of the criminal activity of the two adult sons, the Delaware County Housing Authority (DCHA) initiated eviction proceedings against Bishop for violating a paragraph of her lease which stated that tenants were obliged not to engage in criminal activity including drug-related criminal activity on or near the public housing premises and to have the tenant's guests, any family member or other person under the tenant's control refrain from such activity. The DCHA filed a complaint with a district justice who ruled against Bishop. Bishop appealed. A panel of arbitrators of the Court of Common Pleas of Delaware County (common pleas court) entered an award for Bishop. The DCHA appealed to the common pleas court and filed an action in ejectment for possession of the premises. The common pleas court ruled in favor of Bishop and subsequently denied the DCHA's motion for a new trial. The Delaware County court based its decision in part on the lack of any evidence that Bishop was in control of her adult sons or that she was aware of their criminal activity. *Bishop,* 749 A.2d at 999.

On appeal, this Court agreed that the provision of the lease limited eviction to situations where the tenant had control over the person committing the criminal activity. *Bishop,* 749 A.2d at 1000. This Court further determined based on the congressional intent in directing housing authorities to insert clauses in their leases that the term "under the Tenant's control" modified both guests and members of the tenant's household. *Bishop,* 749 A.2d at 1001–1002. This Court affirmed and held:

> For the foregoing reasons, we refuse to hold a tenant strictly liable for unforeseeable criminal acts committed, without the tenant's knowledge, by family members who are not under the tenant's control. Here, because Bishop had no

knowledge of her sons' criminal conduct, because her sons were not under her control, and because Bishop reasonably could not have foreseen her sons' criminal conduct, Bishop's eviction would be contrary to Congress' intent in enacting 42 U.S.C. § 1437d(*l*)(5).

*Bishop,* 749 A.2d at 1002.

Recently in, *Rucker v. Davis,* 237 F.3d 1113 (9th Cir.2001), the Ninth U.S. Circuit Court of Appeals addressed this same issue. In *Rucker,* the Oakland Housing Authority commenced separate unlawful detainer actions in Alameda County Municipal Court against four tenants, Pearlie Rucker (Rucker), Willie Lee (Lee), Barbara Hill (Hill) and Herman Walker (Walker), and collectively, (the tenants) for separate violations of the lease provision that obligated the tenant to "assure that tenant, any member of the household, or another person under the tenant's control, shall not engage in ... [a]ny drug-related criminal activity on or near the premises...." Rucker's mentally disabled daughter who lived with her was found in possession of cocaine three blocks from the apartment. Rucker asserted that she regularly searched her daughter's room for evidence of drug and alcohol use and had never found any such evidence. Lee, seventy-one, and Hill, sixty-three, each had grandsons living with them. The grandsons were caught smoking marijuana together in the apartment complex parking lot. Walker, a disabled seventy-five year old, required an in home caregiver. The caregiver was found with cocaine in Walker's apartment. *Rucker,* 237 F.3d at 1115–18.

The tenants commenced an action in federal district court and alleged that 42 U.S.C. § 1437d(*l*)(6) did not authorize the eviction of innocent tenants. The district court granted the tenants a preliminary injunction and enjoined the actions in state court and the enforcement of HUD's regulation and the corresponding provision of the lease against innocent tenants. On appeal, a panel of the Ninth Circuit of the U.S. Court of Appeals reversed. The Ninth Circuit granted review *en banc. Rucker,* 237 F.3d at 1117–18.

The Ninth Circuit affirmed the district court's order that granted the preliminary injunction. The Ninth Circuit reviewed the language of 42 U.S.C. § 1437d(*l*)(6) and concluded:

> Section 1437d(*l*)(6) is not a picture of clarity and may be subject to varying interpretations. When read in conjunction with the remainder of § 1437d(*l*) and other provisions enacted at the same time, however, it appears that Congress did not intend subsection (6) to apply to the eviction of innocent tenants. Any doubts that persist about Congress's intentions, however, are firmly resolved by the legislative history and the principles of statutory construction....

*Rucker,* 237 F.3d at 1123.

The Authority contends that it presented evidence from which a factfinder could reasonably infer that Andre was under the control of Fields. However, the evidence presented only established that Andre was listed on the Lease, that he was Fields' son, and arguably, that he had no income. After giving the Authority the benefit of the doubt on all evidence, the trial court correctly concluded that the Authority did not shoulder its burden.

Accordingly, we affirm.

### ORDER

AND NOW, this 28th day of March, 2001, the order of the Court of Common Pleas of Allegheny County in the above-captioned matter is affirmed.

PELLEGRINI, Judge, Dissenting.

I respectfully dissent from the majority's finding that for a housing authority to evict a tenant due to a household member's drug activity, knowledge or consent on the part of the tenant has to be shown. To the contrary, Congress, in enacting Section 1437d(*l*)(5) of the Anti–Drug Abuse Act, authorized housing authorities to evict a tenant if a household member engaged in drug activity at or near a public housing community, even if the tenant had no knowledge that the household member was engaged in such activity. Even if I agreed with the majority's interpretation of the Act, I would still dissent because, even under that interpretation, the tenant has the burden to establish that he or she was unaware of the drug dealing of the household member.

Marcella Fields (Fields) leased property from the Housing Authority of the City of Pittsburgh (Housing Authority) in Addison Terrace, a public housing community that contains 800 dwelling units. Because she reported that her household income was $150 per month, and rent was calculated at one-third of that amount, Fields paid $50 a month in rent. Her adult son, Andre, along with another adult son, lived with her and was named on the lease as a household member, but no income was reported for either of her sons. The lease which Fields signed provided that a tenant would be in default of the lease if the tenant, household member or guest failed to perform any of the promises, terms, provisions or conditions of the lease, especially as related to a tenant's obligations in paragraph 8 of the lease. Paragraph 8 provided:

Tenant shall not engage in and *shall prevent any Household Member or guest under the Tenant's control* from engaging in:

(1) Any drug related criminal activity, including but not limited to, the presence of an illegal controlled substance in the unit or adjacent to the premises. The physical presence of the controlled substance rather than actual ownership of the drugs shall constitute a material breach of this agreement and amounts to grounds for immediate lease termination in compliance with Pennsylvania law.

(2) Any criminal activity that threatens the health, safety or right to peaceful enjoyment of Housing Authority property by other Tenant or employees of Management. (Emphasis added.)

On March 14, 1998, Andre was arrested and charged with possession of a controlled substance, 16 individually wrapped baggies of crack cocaine, with intent to deliver and resisting arrest. The activity occurred in front of Fields' unit. He was convicted of those charges on February 1, 1999. As a result of this lease violation, the Housing Authority terminated Fields' lease but she refused to vacate the premises.

The Housing Authority went to a district justice who entered judgment in Fields' favor. The matter was appealed to the trial court but Fields' attorney moved for a non-suit on the basis that the Housing Authority failed to meet its burden of proving that she engaged in a material breach of the lease because it did not prove she had knowledge of her son's criminal activities. The trial court granted the non-suit, finding that Fields did not breach the lease agreement because her son, as an adult, was not under her control and she did not do anything personally to breach the lease. The Housing Authority then took this appeal.

In affirming the trial court, the majority holds that the Housing Authority did not establish that Fields had control over An-

dre's activities. It does so based on our decision in *Delaware County Housing Authority v. Bishop*, 749 A.2d 997 (Pa. Cmwlth.2000), where we decided that "based on the congressional intent in directing housing authorities to insert clauses in their leases, that the term 'under the Tenant's control' modified both guests and members of the tenant's household." (Majority decision at p. 108.) It also relies on the Ninth Circuit's recent split 7–4 *en banc* decision in *Rucker v. Oakland Housing Authority*, 237 F.3d 1113 (9th Cir.2001). The majority then concludes that there was not enough evidence presented by the Housing Authority to prove that Fields had control of her son. I dissent both because I disagree with *Bishop's* interpretation of the lease language to require a tenant to have control of a household member, and even if that interpretation is correct, because the burden of proving lack of control of the household member is on the tenant.

The lease language at issue here emanates from the United States Housing Act, 42 U.S.C. § 1437 et seq., that was enacted in 1937 and amended in 1988 by the Anti–Drug Abuse Act to include Section 1437d(*l*)(5), whose intent was to improve living conditions and attack the drug problems in public housing. Under 42 U.S.C. § 1437d(*l*)(5), Congress required:

Each public housing agency shall utilize leases which:

(5) provide that a public housing tenant, any member of the tenant's household, or a guest or other person under the tenant's control shall not engage in criminal activity, including drug-related criminal activity, on or near public housing premises, while the tenant is a tenant in public housing, and such criminal activity shall be cause for termination of tenancy.

In 1990, 42 U.S.C. § 1437d(*l*)(5) was slightly amended by the Cranston–Gonzalez National Affordable Housing Act to limit the criminal activity, other than drug activity, that threatened the peaceful enjoyment by other tenants.[1] It provided as follows:

Each public housing agency shall utilize leases which:

(5) provide that any criminal activity that threatens the health, safety or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or near such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy.

In implementing this provision in 1991, the United States Department of Housing and Urban Development issued regulations requiring local public housing authorities, such as the Housing Authority of the City of Pittsburgh, to impose a lease obligation on tenants:

To assure that the tenant, any member of the household, a guest, or another person under the tenant's control, shall not engage in:

(A) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the PHA's public housing premises by other residents or employees of the PHA, or

(B) Any drug-related criminal activity on or near such premises.

Any criminal activity in violation of the preceding sentence shall be cause for

---

1. In 1998, 42 U.S.C. § 1437d(*l*)(5) remained unchanged but was redesignated as subsection (*l*)(6). Although the Court in *Rucker* refers to subsection (*l*)(6) rather than (*l*)(5), this dissent will follow the majority's use of subsection (*l*)(5).

termination of tenancy, and for eviction from the unit.

24 C.F.R. § 966.4(f)(12)(i). When issuing these regulations, HUD made it clear that it interpreted the statute and its own regulations to mean that local housing authorities had the ability to evict a tenant whose household members or guests were involved in drug activity, whether the tenant knew or should have known of the activity or tried to prevent the activity. Public Housing Lease and Grievance Procedures, 56 Fed.Reg. 51, 560, 51567 (Oct. 11, 1991) ("The tenant should not be excused from contractual responsibility by arguing that the tenant did not know, could not foresee, or could not control behavior by other occupants of the unit."). It was under both the Act and HUD regulations that the Housing Authority placed Paragraph 8 in its lease to provide for the eviction of a tenant for drug activity as well as drug activity of household members.

The policy behind the initial enactment of 42 U.S.C. § 1437d(*l*)(5) as well as the HUD regulations, was the result of Congressional findings made in 1988 that the federal government had a duty to provide public and other federally assisted low-income housing that was safe and free from illegal drugs, and that such housing in many areas suffered from rampant drug-related or violent crime. 42 U.S.C. § 11901(1) and (2). However, imposing strict liability by requiring that a tenant be evicted even though he or she did not know that a member of the household was engaged in illegal drug activity had the harsh result of evicting every member of a family, sometimes innocent young children. Conversely, though, not to evict the tenant would result in there being no consequences for tenants who did not monitor their household members who sold drugs to innocent young children who occupied other public housing authority units as well as the attendant disorder associated with drug sales.

Not surprisingly, this dilemma that there may be innocent victims no matter which way the Act is interpreted, as well as some murky legislative history, has led to disagreement as to the interpretation of 42 U.S.C. § 1437d(*l*)(5), with some courts holding that the plain language of the statute is not plain enough. That disagreement centers around whether a tenant must have control over a household member in order to be evicted from public housing as a result of that household member's drug-related criminal activity or whether it is a strict liability provision, that is, if a household member is engaged in drug-related activity, eviction is automatic. Compare *Ann Arbor Housing Commission v. Wells*, 240 Mich.App. 610, 618, 618 N.W.2d 43 (2000), and *City of South San Francisco Housing Authority*, 49 Cal.Rptr.2d 367, 41 Cal.App.4th Supp. 13, 18–19 (1995), both holding that a tenant who has no control or knowledge can be evicted for drug activity engaged in by a household member with *Rucker v. Oakland Housing Authority*, 237 F.3d 1113 (9th Cir.2001) and *Charlotte Housing Authority v. Patterson*, 120 N.C.App. 552, 464 S.E.2d 68 (1995), where the tenant must have knowledge/control of the household member's criminal activity.

As stated, the majority's holding that 42 U.S.C. § 1437d(*l*)(5) requires that a tenant must have control or knowledge of a household member's drug activities for the Housing Authority to evict the tenant is based on *Bishop* and *Rucker* which, in turn, rely on two paragraphs from the 302 page Senate Committee on Banking Housing and Urban Affairs Report (Committee Report) regarding the Cranston–Gonzalez National Affordable Housing Act that amended in 42 U.S.C. § 1437d(*l*)(5) the anti-drug provision contained in 42 U.S.C. § 11901 requiring it be placed in public housing leases. However, for the following reasons, I would overrule our decision

in *Bishop* and not rely on *Rucker*, and hold that when a household member engages in drug activity on housing authority property, a tenant can be evicted even if he or she was unaware of the household member's activity.

First, the plain language of 42 U.S.C. § 1437d(*l*)(5) does not require that a housing authority establish that a tenant had control or even knew that a household member engages in drug-related criminal activity; all that it requires is a showing that the household member was engaged in drug activity.[2] It provides, in operative part, that "drug-related criminal activity on or near such premises, engaged in by a public housing tenant, any member of the tenant's household, or *any guest or other person under the tenant's control*, shall be cause for termination of tenancy." (Emphasis added.) "Control" as used in the italicized sub-clause only, relates back to "guests" and not to "household members" who are referred to in identical phrasing as tenants. Under the plain meaning of this provision then, there is no need for a housing authority to establish "control" when a household member has been engaged in drug activity on or near the leased premises.[3]

Second, even if one would find that the provision was ambiguous, then under fed-

---

**2.** When the language of a statute is clear, we must read the statute's provisions in accordance with their plain language. 1 Pa.C.S. § 1903 (words and phrases will be construed according to their plain and ordinary meaning); 1 Pa.C.S. § 1921(b) (when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit). *See also Johns–Manville Corporation v. United States*, 855 F.2d 1556 (Fed.Cir.1988), *cert. denied*, 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989) regarding federal statutory interpretation (the plain meaning of a statute is controlling absent clear legislative intent to the contrary).

**3.** In *Rucker*, the majority found that Section 1437d(*l*)[(5)] did not have a plain meaning but rather was ambiguous. It did so based not on the words of this provision but, in part, on the words that it believed were left out. The words that were left out were that nothing in the language expressly addresses the level of personal knowledge or fault that was required for eviction. What this ignores is that Congress made Section 1437d(*l*)[(5)] a strict liability provision and no personal knowledge or fault is needed to warrant eviction when a household member engaged in drug activity. Otherwise, why would this provision require control by the tenant over guests?

The *Rucker* majority also found the statute ambiguous because the enforcement of the plain language of § 1437d(*l*)[(5)] would lead to absurd results because it contains neither temporal nor geographic limitations on the drug-related criminal activity, and a tenant could be evicted if that tenant's household member used drugs "five years earlier on the other side of the country." As the *Rucker* dissent pointed out, it would permit the judiciary to nullify any legislative act amenable to a single absurd hypothetical construction and is inconsistent with the traditional role of a court to adjudicate the specific controversy before it and to avoid speculative and general pronouncements. *FCC v. Pacifica*, 438 U.S. 726, 743, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978).

After it found that it was ambiguous, the majority in *Rucker* then went in search of its meaning. It went on to find that because there were other provisions of this section that allowed evictions only for "serious and repeated violations of the terms and conditions of the lease or for other good cause," Section 1437d(*l*)[(5)], and that the forfeiture provision of the Controlled Substances Act, 21 U.S.C. § 881(a), was amended in the same chapter and subtitle of the Anti Drug Abuse Act of 1988, providing "that property should be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." *Id.*, 237 F.3d at 1121. Because you had to read all the relevant provisions of the Cranston–Gonzalez National Affordable Housing Act as a harmonious whole, it found Congress must have intended that for a tenant to be evicted under Section 1437d(*l*)[(5)], he or she

eral and Pennsylvania law, we would be required to give deference to the agency's interpretation of the statute. *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Tool Sales & Service Co. v. Commonwealth,* 536 Pa. 10, 22, 637 A.2d 607, 613 (1993). Because HUD, the agency charged with administering public housing, issued regulation and policy guidance that the statute did authorize the eviction of a tenant who was unaware that a household member was selling drugs on the premises, that interpretation should be given deference.[4]

Third, nothing in the legislative history supports an interpretation that knowledge

of a tenant of a household member's drug dealing was necessary to evict a household member. No committee reports accompanied the original version of 42 U.S.C. § 1437d(*l*)(5) in 1988, and nothing in the legislative history in the Committee Report recommending the amendment to 42 U.S.C. § 1437d(*l*)(5) embodied in the Cranston Gonzalez National Affordable Housing Act passed in 1990 acts to contravene the plain language of this provision. The amendment only dealt with limiting criminal activity for which eviction could be sought to criminal activity that threatened the health, safety or right to peaceful enjoyment of the premises by other tenants. Not changed by the amendment was the language passed two years earlier provid-

---

must have had knowledge and control over the household member for his drug dealing on housing authority property.

What this argument ignores is that all the provisions were not to be interpreted as a harmonious whole because, as the *Rucker* dissent points out, different policy considerations are involved when terminating a lease and forfeiting property. Forfeiture is taking of property that one owns involved in criminal activity and not a lease on property that the tenant does not own and is there only as long as he or she complies with lease terms. The requirement in the forfeiture provision that for the tenant to have his property forfeited, he or she must have knowledge or consent that his or her property was used in an illegal activity, also shows that Congress knew how to provide in Section 1437d(*l*)[(5)] for a tenant's knowledge and consent to be evicted and by not doing so they wanted it to be a strict liability statute.

4. Finding that Congress had spoken on the issue of tenant knowledge/control based on principles of statutory construction, and that HUD's interpretation of Section 1437d(*l*)[(5)] was contrary to congressional intent and did not control, the Court in *Rucker* stated:

Because we find that Congress had an intention on the precise question at issue that is contrary to HUD's construction, HUD's interpretation is not entitled to deference. *See Chevron,* 467 U.S. at 843 n. 9. "The

judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* Thus, we do not reach the question under *Chevron* of whether an administrative interpretation is reasonable or permissible, for "if the intent of congress is clear, that is the end of the matter." *Id.* at 842.

*Id.,* 237 F.3d at 1119. This position seems to have been presaged by the concurring opinion in *Gorbach v. Reno,* 219 F.3d 1087 where five members of the 11–member court, including the authoring judge in *Rucker,* would have held that if the history of the statutory scheme, the principle of seeking a "symmetrical and coherent" statutory scheme and common sense dictated otherwise, no deference had to be given to the agency position. What the *Rucker* majority ignores is that once it found 42 U.S.C. § 1437d(*l*)[(5)] ambiguous, there was no clear congressional intent and deference had to be given under *Chevron* to the agency's interpretation. In effect, the Ninth Circuit's position is that it is giving no deference to the agency's interpretation, if it is not in accord with the court's own interpretation of the statutory provision. While that may be a better position of what Congress believed what the proper scope of review of questions of law was when it enacted the Administrative Procedure Act, 5 U.S.C. § 551 *et. seq.* in 1945, it is not in accord with *Chevron.*

ing that "drug-related criminal activity on or near such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy." Any language in the committee report issued at the time the Cranston–Gonzalez National Affordable Housing Act was passed in 1990 is not especially probative to interpret language that remained unchanged from the language in 42 U.S.C. § 1437d(*l*)(5) passed two years earlier in 1988.

Even if it was deemed probative, the provisions in the Committee Report relied on in *Bishop* and *Rucker* do not support an interpretation contrary to the plain meaning of the provision. The first passage from the congressional committee report relied on states:

> The Committee anticipates that each case will be judged on its individual merits and will require the wise exercise of humane judgment by the public housing authority and the eviction court. For example, eviction would not be the appropriate course if the tenant had no knowledge of the criminal activities of his/her guests or had taken reasonable steps under the circumstances to prevent the activity.

S.Rep. No. 316, 101st Cong., 2d Sess. 179 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5941. While not entirely clear as to what the first sentence was referring to, the example limits lack of knowledge to guests, not to household members.

The second passage from the Committee Report relied upon provides that:

> The committee assumes that if the tenant had no knowledge of the criminal activity or took reasonable steps to prevent it, then good cause to evict the innocent family members would not exit [sic].

S.Rep. No. 316, 101st Cong., 2d Sess. 127 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5889. This passage is, at best, ambiguous as to whether "innocent family members" should not be evicted due to the criminal conduct of other household members or if the language only insulates them from the criminal conduct of their guests. While in the federal system a clear expression of congressional intent contained in a committee report sometimes appears to be able to make the plain language ambiguous, ambiguous expression by a committee report has never been held to trump the plain language contained in a statute. *Rust v. Sullivan,* 500 U.S. 173, 189–190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *Miller v. Civil City of South Bend,* 904 F.2d 1081 (7th Cir.1990).[5]

**5.** Although the Court in *Rucker* acknowledged that no House or Senate reports accompanied the original version of Section 1437d(*l*)[(5)], it nonetheless rejected HUD's contention that public housing authorities had broad discretion in the eviction of innocent tenants based on the 1990 committee report stating that each case would be judged on its individual merits. Rather, the Court concluded that the report was very clear that the eviction of innocent tenants was not appropriate because in such circumstances, good cause to evict would not exist. Again, the majority in this case does not address the committee report. The *Rucker* dissent cogently dismisses the *Rucker* majority position, stating:

Congressional treatment of § 1437d(*l*)(6) since its initial passage in 1988 makes clear that Congress meant what it said. Long before this litigation began, concerns about the eviction provision's applicability to ignorant tenants were expressed. In a 1989 congressional hearing, for example, the associate director of the American Civil Liberties Union (ACLU) argued that "PHAs should be restrained from imposing the sanction of eviction unless they can prove that a tenant had knowledge and actual control over the actions of a household member or third party." Drugs in Federally Assisted Housing: Hearings on S.566

Tenants in public housing should have the same rights as tenants of private landlords—the right to safe and crime-free premises in which their children will not be approached by a dope dealer pushing drugs. There is no doubt that any private landlord would be in his right to evict a tenant whose household member was engaged in drug dealing activities whether or not the tenant knew that a household member was engaged in such activity. In enacting this provision, it was the intent of Congress to allow a housing authority, just like a private landlord, to evict a tenant regardless of knowledge of the activity to create a strong incentive for public housing tenants to make sure that household members did not sell, manufacture, distribute, use or possess controlled substances. By doing so, Congress intended public housing to be a sanctuary, not a place of drug dealing and disorder.

Because the safety and security of public housing tenants, which is the purpose behind Section 1437d($l$)(5), justifies the eviction of "innocent" tenants, the imposition

Before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking, Housing, and Urban Affairs, S. Doc. No. 101–234, at 90–91 (1989). In that hearing, the ACLU brought to the attention of the committee several instances where ignorant tenants were subjected to eviction proceedings. S. Doc. No. 101–234, at 86–87; Davidson, Public Housing Aides Push to Evict Drug Users, Sometimes Violating the Rights of Other Tenants, Wall St. J., Jul. 6, 1989 at A12. Congress did not respond favorably. Subsequent to this hearing, Congress amended the eviction provision, but failed to include an innocent owner exception. National Affordable Housing Act, Pub.L. 101–625, § 504, 104 Stat. 4079 (1990) (substituting provisions relating to criminal activity threatening health, safety or peaceful enjoyment of other tenants for provisions relating to criminal activity generally).

Likewise, as part of the notice and comment procedure necessary for implementing its regulations, HUD received substantial criticism of the applicability of § 1437d($l$)(6) to ignorant tenants. "Comment by legal aid and by tenant organizations ... alleges that the tenant should not be responsible if the criminal activity is beyond the tenant's control, if the tenant did not know or have reason to foresee the criminal conduct, ... or if the tenant has done everything "reasonable" to control the criminal activity." 56 Fed.Reg. at 51,566 (1991). HUD nevertheless interpreted § 1437d($l$)(6) to grant discretion to PHAs to evict ignorant tenants. 56 Fed.Reg. at 51,-567.

Subsequent to these comments and subsequent to implementation of the HUD regulations, Congress once more amended the eviction statute—and again failed to include an innocent owner exemption. These inactions of Congress are highly significant. "As a matter of statutory construction, we 'presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.'" *United States v. Hunter*, 101 F.3d 82, 85 (9th Cir.1996) (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–185, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988)). In Hunter, this court presumed Congress was aware of judicial decisions interpreting a criminal statute when it amended that statute many years after its initial passage. "Accordingly, the only reasonable interpretation of Congress omission of language ... is that Congress intended [the judicial interpretation to control]." *Hunter*, 101 F.3d at 85.

Likewise, in this instance, Congress was aware that the administrative agency charged with implementing the eviction provision construed it to permit eviction of ignorant tenants. This interpretation had been challenged on both policy and constitutional grounds before Congress and in HUD's notice and comment procedures. Congress itself has shown its concern for ignorant tenants by protecting them with specific language in other legislative enactments. Congress, however, did not provide an exemption for ignorant tenants when it amended § 1437d($l$)(6) in 1996. This court does not have the power to amend the statute. Congress clearly intended HUD's interpretation of the eviction statute to prevail. (Footnotes omitted.)

*Rucker*, 237 F.3d at 1134.

of liability without fault is not unreasonable. Any argument that Congress did not intend such a harsh result of evicting "innocent" tenants because their adult children engaged in drug dealing and other criminal activity ignores that if the tenant engages in the drug activity, the tenant's innocent young children are also evicted as a result of their parents' transgressions. Congress has settled any policy debate on which innocent victims suffer by imposing strict liability by evicting the tenant whose household member is engaging in the illegal activity, not the law-abiding members of the public housing authority community whose children are preyed upon by drug dealers residing in other units. Any harm caused to "innocent tenants" was not inflicted by Congress or the Housing Authority but by household members as, in this case, by Fields' adult child.

However, even under our holding in *Bishop,* where the tenant presented evidence that she had no knowledge of the illegal activity, I would vacate and remand the trial court's decision. *Bishop* only held that 42 U.S.C. § 11901 was not a strict liability statute but did not hold that the housing authority had the burden to establish knowledge or control by the tenant over a household member. Even the majority in *Rucker* found that a tenant was required to show that he or she did not know that drug activity was taking place stating:

It is also furthered by imposing a duty on tenants to take reasonable steps to control the drug or criminal activity of family members and guests or face eviction. There is no dispute that the eviction of tenants who personally engage in drug activity or of tenants who turn a blind eye to the activities of household members or guests falls squarely within the language of the statute under either party's reading.

*Rucker,* 237 F.3d at 1120.[6]

Even if I agreed with the majority's reasoning that there is an innocent owner defense, I would hold that once the Housing Authority proves that there is criminal activity of a household member requiring an eviction, the burden then shifts to the tenant to prove that he or she did not know or have reason to know that the household member was engaged in criminal activity. Because judgment was entered on a non-suit after the Housing Authority had met its initial burden, I would remand for Fields to establish she was unaware that her son, Andre, who she reported as having no income, was selling drugs outside her door.

For the above reasons, I dissent.

President Judge DOYLE joins.

---

**6.** The *Rucker* dissent also points out the impracticability of requiring the Housing Authority to prove knowledge or consent on the part of the tenant stating:

> To require proof of knowledge on the part of the tenant of the criminal activity of a guest is impractical. Proper authorities would seldom, if ever, discover the tenant seated with the drug using guest or while the latter engaged in other drug-related criminal acts. Absent this rare factual situation, the housing authority would be forced to rely on evidence consisting of hearsay, gossip and rumor. Moreover, the lengthy public housing eviction procedure permits a culpable tenant to intimidate or threaten potential witnesses. "When suspected drug dealers were notified that eviction proceedings against them had been started, they sought to punish tenants who might have identified them." 134 Cong. Rec. E1965–02. These tactics against housing tenants have furthered the public housing drug epidemic.

*Rucker,* 237 F.3d at 1136.